

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-4-2002

# Burns v. Comm Social Security

Precedential or Non-Precedential: Precedential

Docket No. 02-1091

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Burns v. Comm Social Security" (2002). *2002 Decisions.* Paper 789.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/789

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed December 4, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1091

JOSEPH BURNS,
        Appellant

v.

*JO ANNE B. BARNHART,
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

*(Pursuant to F.R.A.P. 43(c))

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 01-cv-02917)
District Judge: Honorable Robert F. Kelly

Argued September 9, 2002

Before: BECKER, Chief Judge, ROTH and RENDELL,
Circuit Judges

(Filed: December 4, 2002)

        Michael P. Boyle, Esq. [ARGUED]
        123 South Broad Street, Suite 2140
        Philadelphia, PA 19109
         Counsel for Appellant



        Tara A. Czekaj, Esq. [ARGUED]
        Social Security Administration
        OGC/Region III
        P.O. Box 41777
        Philadelphia, PA 19101
         Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellant, Joseph Burns, challenges the denial of his
application for Supplemental Security Income (SSI) under
Title XVI of the Social Security Act, 42 U.S.C.S 1381 et seq.
While we reject Burns' argument that the record, as it
exists, establishes his eligibility for SSI, we will reverse and
remand because we find that the hypothetical question
posed to the vocational expert by the administrative law
judge did not incorporate all of Burns' limitations.

I.

Burns completed his education through tenth grade. He
most recently worked in a stock position at a beer
distributor. He has not worked since 1986, and last looked
for work in 1989. He is fifty-one years old and has not
acquired any transferable vocational skills.

Burns filed an application for SSI on June 24, 1998,
alleging an onset of total disability on June 15, 1998. In the
application and other related documents, Burns alleged
that he was unable to work due to a heart condition, lung
cancer, a hernia, nerves, arthritis of the hands and knees,
high blood pressure, a stomach disorder, dizziness, and
back pain. The record does not contain extensive medical
documentation of Burns' ailments. It does, however,
contain reports, completed after Burns' application date,
documenting some of Burns' alleged conditions, including a
report of a lumbar spine x-ray showing "early degenerative
changes," various medical reports detailing complaints of
knee, chest and back pain, and a report of a cardiac
catheterization that revealed coronary artery disease. The

2

record also contains reports, completed after he filed his
application, detailing an electrocardiogram that came
within normal limits, an x-ray examination of his chest that
showed a "normal chest," an x-ray examination of Burns'
right knee showing "no arthritic change" and that his knee
was "normal," and a stress test that revealed no exercise-
induced ischemia. In addition, the record indicates that
doctors placed a stent in Burns' arteries in order to relieve
the pain from his coronary artery disease.

The state agency that initially assesses applications for
SSI rejected Burns' application for benefits. After his
request for reconsideration was denied as well, Burns
requested review before an Administrative Law Judge
("ALJ"). Burns testified at the hearing before the ALJ, as did
a vocational expert. The testimony focused mainly on
Burns' alleged physical limitations and how they affected
his ability to work. At the end of the hearing, at counsel's
urging, the ALJ ordered an evaluation of Burns' intellectual
capacity. That evaluation, conducted by Loren Laviolette,
Ed.D., diagnosed Burns as having borderline intellectual
functioning. Because a supplemental hearing was not held
after the psychological evaluation, the ALJ never questioned
Burns or the vocational expert regarding Dr. Laviolette's
findings.

Five months after Dr. Laviolette's evaluation, the ALJ
issued a decision denying Burns benefits. The ALJ found
that Burns "retains the capacity to make an adjustment to
work which exists in significant numbers in the national
economy." The Appeals Council of the Social Security
Administration declined review, effectively making the ALJ's
determination the final decision of the Commissioner of the
Social Security Administration ("Commissioner"). At that

point, Burns had exhausted his administrative remedies. Fargnoli v. Halter, 247 F.3d 34, 38 (3d Cir. 2001).

On June 13, 2001, Burns filed a complaint with the District Court for the Eastern District of Pennsylvania, seeking review of the Social Security Administration's refusal to grant benefits. The District Court had jurisdiction under 42 U.S.C. S 405(g) (2002). The District Court referred the case to a magistrate judge who, in considering cross-motions for summary judgment, recommended granting the

Commissioner's motion. On November 14, 2001, the District Court adopted this recommendation and entered judgment against Burns.

Burns appeals to our court, alleging a number of errors. These may be summarized as follows: (1) the ALJ based his findings on a deficient hypothetical question posed to the vocational expert; (2) the ALJ should have concluded that Burns met or equaled the listed impairment for mental retardation; (3) the vocational expert's conclusion, which the ALJ adopted for his findings of fact, that Burns could engage in substantial gainful activity conflicted with the Dictionary of Occupational Titles; (4) the ALJ incorrectly determined that Burns retained the residual functional capacity for light exertional work; and (5) the ALJ failed to account for either the fact of stress or the side effects of Burns' medication.

We have jurisdiction under 28 U.S.C. S 1291 (2002) and 42 U.S.C. S 405(g) (2002). While our review of the District Court's order is plenary, we may reverse the grant of summary judgment to the Commissioner only if we conclude that the ALJ's findings were not supported by "substantial evidence." Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984); 42 U.S.C. S 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala , 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). We have referred to it as"less than a preponderance of the evidence but more than a mere scintilla." Jesuram v. Secretary of the United States Dep't of Health & Human Servs., 48 F.3d 114, 117 (3d Cir. 1995). We also have made clear that we are not permitted to weigh the evidence or substitute our own conclusions for that of the fact-finder. Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

II.

In order to qualify for SSI, a person must be disabled as that term is defined by the Social Security Act and accompanying regulations. Title XVI of the Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. S 1382c(a)(3)(A) (2002).

Using this definition, the Social Security Administration applies a five-step test to determine whether a person is disabled for purposes of qualifying for SSI.1 20 C.F.R. S 416.920 (2002). Step one requires a determination of whether the claimant is currently engaging in "substantial gainful activity," 20 C.F.R. S 416.920(b), as defined in the regulations. See 20 C.F.R. S 220.141 (2002). If the person is found to be engaged in substantial gainful activity, the application will be denied. Step two of the evaluation process requires that the claimant show that he suffers from a "severe impairment." 20 C.F.R. S 416.920(C). If the claimant fails to show that his impairments are"severe," he will be denied benefits. Step three allows the claimant to demonstrate that his disability meets or equals an impairment listed in Appendix 1 to Subpart P of Part 404 ("Listing of Impairments"). 20 C.F.R. S 416.920(d). At this step, an ALJ often enlists the help of an expert to explain the medical evidence. If the impairment meets or equals a listed impairment, the claimant is considered disabled per se and the evaluation process ends. Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

If, however, the claimant's impairments do not satisfy step three, the claimant must continue on to step four. Step four requires that the claimant demonstrate that he does not have sufficient residual functional capacity to perform his past relevant work. 20 C.F.R. S 416.920(e). Residual functional capacity is defined as "what a [claimant] can still do despite his limitations." 20 C.F.R. S 416.945(a). If the claimant does not demonstrate his

---

1. This test is the same as that for determining whether a person is disabled for purposes of receiving social security disability benefits. Compare 20 C.F.R. S 416.920 withS 404.1520. See also Sullivan v. Zebley, 493 U.S. 521, 526 (1990); Williams v. Sullivan, 970 F.2d 1178, 1181 (3d Cir. 1992). As a result, we consider case law developed under both SSI and social security disability benefits law.

inability to do past relevant work, he will not be considered disabled. If he does, the inquiry moves to step five.

At the final step -- step five -- the burden shifts to the Commissioner to show that the claimant can perform"other work." 20 C.F.R. S 416.920(f). "Other work" must consist of jobs that exist in significant numbers in the national economy that the claimant can perform given his age, education, past work experience, and residual functional capacity. Plummer, 186 F.3d at 428. At the fourth and fifth steps, the ALJ often seeks advisory testimony from a

vocational expert. Id. In addition, the ALJ will generally consult the Dictionary of Occupational Titles (DOT), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine whether any jobs exist that a claimant can perform.

III.

During the hearing held to consider the Commissioner's denial of benefits, the ALJ questioned Burns, as did counsel. No medical expert testified. The questioning focused on the physical limitations alleged by Burns. Burns testified to suffering from a variety of limitations, including lung cancer, stiffness in his hands, arthritis in his knees, back pain, chest pains, breathing problems, high blood pressure, poor blood circulation and other heart-related problems. Burns also testified that he experienced some comprehension problems, had trouble sitting, lifting, and walking, and suffered from drowsiness caused by his medication. In response to his counsel's sole -- and extremely brief -- line of questioning, Burns testified that his drowsiness forces him to sleep two to four hours a day in the middle to late afternoon.

Burns also testified regarding his daily activities. He testified that he takes care of his four dogs, one of which is a 130 pound German Shepherd, and walks them, individually, for fifteen to thirty minutes a day. Further, he told the ALJ that he does the laundry, smokes cigars (but does not drink or take any nonprescription drugs), makes

6

the bed, plays the drums for an hour a day -- albeit in what seem to be five-minute increments -- and goes food shopping, either alone or with his wife. In addition, he testified to having no problem keeping appointments.

A vocational expert was then called to testify. Testimony of vocational experts, as we have said before, "typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ. . . . The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy." Podedworny , 745 F.2d at 217. The ALJ asked the vocational expert a series of hypothetical questions involving Burns, incorporating a number of his alleged limitations. In the second hypothetical -- the only one at issue in this appeal -- the ALJ stated: "I'd like for you to assume a person of the same age, education and work background as Mr. Burns, and further assume that the individual is capable of light exertional work, provided it involves no more than occasional postural activity, and no more than simple repetitive one, two-step tasks. Would such an individual be able to perform . . . other work?" By "other work," the ALJ

was referring to work other than the stock position he had held at the beer distributor. In response to the ALJ's questioning, the vocational expert concluded that Burns could perform other work, naming, as examples, laundry sorter, ticket taker, or packer.2

_____

2. The full exchange reads as follows:

> Q: I'd like for you to assume a person of the same age, education and work background as Mr. Burns, and further assume that the individual is capable of light exertional work, provided it involves no more than occasional postural activity, and no more than simple repetitive one, two-step tasks. Would such an individual be able to perform the stock position that Mr. Burns performed?
>
> A: No.
>
> Q: Would such a person be able to perform other work?
>
> A: Yes.

7

At the close of the hearing, the ALJ granted Burns' counsel's request to have a consultative psychiatric evaluation of Burns conducted, and postponed any decision pending the report from that evaluation.

Thereafter, a consultative psychiatric evaluation was conducted by Loren Laviolette, Ed.D. She performed "a comprehensive disability psychological evaluation with Projective Tests." In her report, Dr. Laviolette detailed the tests she administered as well as other findings. One of the tests was the Wechsler Adult Intelligence Scale-- Revised (WAIS-R) test of intellectual functioning, commonly referred to as an IQ test. On ten of the twelve areas of the test, Burns scored in the "borderline range of intellectual functioning." On what Dr. Laviolette labeled "your best predictor of intelligence," vocabulary, however, Burns scored in the low average range of intellectual functioning. Overall, Burns obtained a verbal score of 75, a performance score of 77, and a full scale score of 75. This score placed Burns in the borderline range of intellectual functioning.

Dr. Laviolette conducted two other tests. On the Bender Gestalt Test of Visual Perceptual Integration, Dr. Laviolette stated that Burns "show[ed] developmental delay and visual psychomotor functioning, some problems in integration, and also showed some rotations that suggest maybe some oppositional tendencies." On the "House, Street, Person Test[,] a Projective Test," Dr. Laviolette noted that Burns "showed some disassociation" and "did show some underlying hostility."

In addition, Dr. Laviolette made a number of observations regarding Burns' intellectual functioning. For one, she

_____

Q: Could you identify a few example [sic] of such work?

A: The person could work as a laundry sorter. He could work as a ticket taker. And also as a packer.

Q: Do you have numbers for those jobs?

A: The laundry sorter, 1400 exist in the region, 60,000 nationally. The ticket taker, 2700 in the region, 250,000 nationally. The packer, 3800 regionally and 250,000 nationally.

observed that Burns' "communication is adequate, although he seems a little flighty." Also, she stated that"[h]e can respond to general information at times and then other times, he seems very scattered or loose in terms of his understanding" and "had some difficulties in the area of comprehension." She further noted that he may have "some oppositional tendencies." As for Burns' overall functioning, Dr. Laviolette opined:

> [I]n terms of occupational adjustment, I would say he'd work fair, at best. In terms of work rules, his common sense is more in the Borderline range. His general intellectual functioning is there. Relating to coworkers, he's kind of hostile. . . . His judgment is borderline. . . . His interaction with an authority figure, he would need an authority figure to keep an eye on him. . . . Functioning independently, again, he's borderline. He would be fair, at best. His attention and concentration was in the Borderline range of intellectual functioning. His Verbal and Performance test scores were consistently in the Borderline range. He would not be good at doing complex or detailed types of task. He would only be able to do simple tasks in a fair way at best. . . . He behaved in an emotionally stable manner fair, at best. Again, he does show some flightiness of ideas, disassociated kind of ways, and he shows underlying hostility. In a social situation, he does try to avoid trouble, but he would need supervision, and he seems to have some loose associations that some people would just wonder where he is coming from. . . . Reliability: He is borderline in terms of his general intellectual functioning.

As noted above, the ALJ did not order a supplemental hearing after receiving Dr. Laviolette's report, nor did Burns request one.

On March 8, 2000, the ALJ issued his ruling denying benefits. In his opinion, the ALJ detailed his findings at all five steps of the evaluation process. As for step one, the ALJ found that Burns had not been engaged in substantial gainful activity since 1986, when he worked for the beer distributor. At step two, the ALJ determined that the medical evidence established that Burns had three severe

impairments: coronary artery disease, a back disorder, and borderline intellectual functioning. The ALJ, however, did not find these impairments to meet or equal the criteria of any of the impairments contained in the Listing of Impairments; thus, the ALJ moved to step four. At step four, the ALJ found that Burns was unable to perform his past relevant work at the beer distributor, and moved to step five.

It was at step five of the evaluation process that the ALJ found Burns not disabled. In making this determination, the ALJ noted that he took into consideration a number of factors. He noted that Burns was considered a younger individual, had completed school only up to the tenth grade, and had only unskilled work experience. The ALJ also noted his conclusions regarding Burns' allegations of his physical and mental limitations. He found Burns' assertion that he had lung cancer and arthritis "medically indeterminable," and that Burns' alleged pain in both his knees and his alleged hypertension was "non-severe." In addition, the ALJ apparently found Burns' allegations of chest, back, and knee pain, as well as the alleged drowsiness caused by his medication, not fully credible. Most importantly, the ALJ concluded that Burns retains "the mental residual functional capacity to perform simple repetitive tasks" as well as "the residual functional capacity for a range of light exertional work and occasionally can climb, balance, stoop, kneel, crouch and crawl, and perform simple repetitive tasks." The District Court, upon the recommendation of the magistrate judge, upheld the ALJ's ruling in its entirety.

IV.

On appeal, Burns urges that the ALJ committed a number of errors -- that we summarized at the outset -- warranting either remand or outright reversal. We address these arguments in turn.

A.

Initially, Burns contends that the vocational expert's testimony did not provide substantial evidence because the

ALJ's questioning of the vocational expert was deficient. Specifically, Burns argues that the hypothetical questions posed by the ALJ to the vocational expert regarding Burns' residual functional capacity improperly failed to incorporate Burns' borderline intellectual functioning. We agree.

At the hearing, the ALJ solicited testimony from the vocational expert through a series of hypothetical questions. Again, in the hypothetical question at issue here, the ALJ stated: "I'd like for you to assume a person of the same age, education and work background as Mr. Burns,

and further assume that the individual is capable of light exertional work, provided it involves no more than occasional postural activity, and no more than simple repetitive one, two-step tasks. Would such an individual be able to perform . . . other work?"[3] In response, the vocational expert concluded that Burns could work as a laundry sorter, ticket taker, or packer. The ALJ adopted this conclusion for his finding that Burns could make a successful vocational adjustment to work that exists in significant numbers in the national economy, as required for step five in the evaluation process.

Burns argues that this hypothetical question did not take into account his deficiency in intellectual functioning as disclosed in Dr. Laviolette's report. Quite clearly, the ALJ did not pose any questions to the vocational expert based on Dr. Laviolette's report -- the report did not exist at the time of the hearing. Nevertheless, the Commissioner contends that the ALJ's use of the factor of "simple repetitive one, two-step tasks" was sufficiently descriptive to encompass the post-hearing findings of Dr. Laviolette. Our case law, however, directs that greater specificity is required.

Discussing hypothetical questions posed to vocational experts, we have said that "[w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's

_____

3. Although the ALJ asked the vocational expert other hypothetical questions, those questions are not at issue here because, in them, the ALJ asked the vocational expert to make assumptions regarding Burns' residual functional capacity that the ALJ did not eventually adopt as a part of his findings of fact -- a conclusion that we do not disturb.

11

testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny, 745 F.2d at 218. A hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments." Chrupcala v. Heckler , 829 F.2d 1269, 1276 (3d Cir. 1987) (emphasis added). Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence. Podedworny, 745 F.2d at 218 (citing Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983)).

Here, the ALJ's hypothetical did not refer to any of the type of limitations later outlined in Dr. Laviolette's report. Instead, it merely referred to "simple repetitive one, two-step tasks." This phrase, however, does not specifically convey Burns' intellectual limitations referenced in Dr. Laviolette's report. Rather, it could refer to a host of physical and mental limitations, such as a person's

mechanical or small motor skills, his lack of initiative or creativity, or a fear of, or unwillingness to take on, unfamiliar tasks. While the phrase could encompass a lack of intelligence, it does not necessarily incorporate all of the borderline aspects of Burns' intellectual functioning or the other deficiencies identified in Dr. Laviolette's report. For example, it certainly does not incorporate Dr. Laviolette's finding that Burns is borderline in the areas of reliability, common sense, ability to function independently, and judgment, or that he manifests flightiness, disassociation, oppositional tendencies, and difficulties in comprehension. As a result, the hypothetical did not include all of the limitations suffered by Burns, thus making it deficient.

The Commissioner relies upon the opinion of the Court of Appeals for the Eighth Circuit in Howard v. Massanari, 255 F.3d 577 (8th Cir. 2001), as authority for finding the hypothetical to be sufficiently inclusive of Burns' limitations. In Massanari, the Court held that an ALJ's hypothetical question that asked the vocational expert to assume that the claimant was able to do "simple, routine,

12

repetitive work" accounted for the claimant's borderline intellectual functioning and other deficiencies. Id. at 582. But, Massanari can be readily distinguished on its facts. The Massanari Court clearly noted that the deficiencies in intellectual functioning that the psychological evaluation identified were in "concentration, persistence,[and] pace." Id. These few specific deficiencies, the court concluded, were accounted-for in the phrase used in the hypothetical -- "simple, routine, repetitive work." Burns' mental deficiencies, however, go far beyond those of the claimant in Massanari. The phrase "simple, routine, repetitive work" (or the similar phrase used in Burns' hypothetical) is not sufficiently descriptive of the previously noted deficiencies that Dr. Laviolette diagnosed.

Because the ALJ based his finding, at step five of the evaluation process, that Burns could perform a significant number of jobs in the national economy on this deficient hypothetical question, we find that it was not based on substantial evidence. See Chrupcala, 829 F.2d at 1276. Under these circumstances, once Dr. Laviolette's report detailing Burns' intellectual functioning limitations had been obtained, the ALJ should have held another hearing so that a complete hypothetical could have been posed to the vocational expert.

The deficiency in the hypothetical, along with the fact -- as detailed below -- that we reject Burns' contention that, based on the record before us, he meets or equals an impairment found in the Listing of Impairments, necessitates that we remand to the Commissioner for further proceedings. See Wallace v. Secretary of Health and Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983).

B.

Burns also claims that the ALJ erred in not finding that he suffers from "mental retardation," as defined in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, Appx. I S 12.05. Accordingly, Burns claims we should find him per se disabled, making remand based on the deficient hypothetical unnecessary. We disagree.

Under S 12.05 of the Listing of Impairments, a person suffering from "mental retardation" is considered disabled if he can demonstrate, in addition to other requirements, that he falls within one of its four sub-sections outlining sufficient degrees of severity.4 Burns alleges that he falls within sub-section "C," which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation."

_____

4. Section 12.05 reads in whole part:

   12.05 Mental retardation. Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning manifested during the development period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

   The required level for this disorder is met when the requirements in A, B, C, or D are satisfied.

   A. Mental incapacity evidenced by dependence upon others for personal needs (e.g. toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

   OR

   B. A valid verbal, performance, or full scale IQ of 59 or less;

   OR

   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

   OR

   D. A valid verbal, performance, or full scale IQ of 60 through 70 resulting in at least two of the following:

   1. Marked restriction of activities of daily living; or

   2. Marked difficulties in maintaining social functioning; or

   3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended
    duration.

20 C.F.R. Pt. 404, Subpt. P, Appx. I, S 12.05.

14

We have stated that under sub-section C, "a claimant is presumptively disabled if a) he is mentally retarded, as evidenced by an IQ between 60 and 70, and has been so since before the age of 22; and b) he has another impairment, in addition to the mental retardation, that imposes an additional and significant work-related limitation." Williams, 970 F.2d at 1184. Thus, Burns first must show that his IQ score is between 60 and 70. As stated above, Burns scored a verbal score of 75, a performance score of 77, and a full scale score of 75 on the IQ test administered by Dr. Laviolette. Because the Commissioner uses the lowest of the three scores in the WAIS-R series of tests, see 20 C.F.R. Pt. 404, Subpt. P, App. I, S 12.00(D), Burns' IQ is 75 for purposes of his SSI claim.

Based on his score, then, Burns' claim clearly fails. He does not have an IQ score between 60 and 70. Burns, however, argues that, in determining his IQ score for purposes of the regulation, the Commissioner should take into account the five-point margin of error for IQ scores, as outlined in the Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. rev. 2000) ("DSM-IV").5 Accordingly, Burns urges that his IQ should be considered to be 70. Burns finds support for his argument in several opinions of district courts within our circuit. See Gist v. Barnhart, No. Civ. A. 01-2754, 2002 WL 1932808, at *2 (E.D. Pa. Aug. 2, 2002); Gorecki v. Massanari, 197 F. Supp. 2d 154, 163 (M.D. Pa. 2001); Hampton v. Apfel, No. Civ. A. 97-6651, 1999 WL 46614, at *3 (E.D. Pa. January 6, 1999); Halsted v. Shalala, 862 F. Supp. 86, 90 (W.D. Pa. 1994). But we note that there are a fair number of opinions adopting the opposing viewpoint, including two opinions from district courts within our circuit. See Williams v. Apfel , No. 99-039, 2000 WL 376390, at *12 (D. Del. March 30, 2000) (refusing to take into consideration a measurement error of 5 points); Colavito v. Apfel, 75 F. Supp. 2d 385, 402-04 (E.D. Pa. 1999) (same); see also Anderson v. Sullivan, 925 F.2d 220,

_____

5. The Commissioner does not dispute the existence of this margin of error. It should be noted, however, that the DSM-IV lists the five points as an approximate error range. Diagnostic and Statistical Manual of Mental Disorders 42 (4th ed. rev. 2000).

15

223 (7th Cir. 1991) (holding that it was proper not to factor an error range into a claimant's IQ); Lawson v. Apfel, 46 F. Supp. 2d 941, 948 (W.D. Mo. 1998) (refusing to take into consideration a measurement error of 5 points); Bendt v.

Chater, 940 F. Supp. 1427, 1431 (S.D. Iowa 1996) (same).

We conclude that if we were to read an error range of five points into the regulation, it would violate the plain language of the regulation, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, Appx. I, S 12.05. The basic tenets of statutory construction hold true for the interpretation of a regulation such as this, see Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998), and we cannot ignore the plain wording of the regulation. See Wilson v. United States Parole Comm'n, 193 F.3d 195, 198-200 (3d Cir. 1999) (refusing to defer to the Sentencing Commission's interpretation of one of its own regulations where that regulation is clear and unambiguous). Where the language of a regulation is plain and unambiguous, as it is here, further inquiry is not required. Idahoan Fresh, 157 F.3d at 202.

Moreover, Burns has not offered any reason why we should not assume that the Commissioner, in promulgating the regulation, was aware of the standard margin of error and could have incorporated or referenced it if the stated numbers were to be given an expansive reading.6 Incorporating the error range would essentially alter the regulatory language to say "IQ of 60 through 75," rather than "IQ of 60 through 70." We know of no authority allowing us to do so. In fact, the true five-point error in Burns' score of 75 could just as easily mean that his actual

_____

6. Another factor counseling against the incorporation of the error range is the fact that, as mentioned above, the regulations already have directed that "[i]n cases where more than one IQ is customarily derived form the test administered, e.g., where verbal, performance, full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." Thus, a policy of giving the claimant the "benefit of the doubt" is already incorporated into the regulations. Burns, in fact, benefitted from the policy. While he scored a verbal score of 75, a performance score of 77, and a full scale score of 75, the regulations instruct that his score be considered a 75.

16

IQ is 80 rather than 75. So, automatically reading 75 to mean "70" could result in a number of persons who are clearly not mentally retarded under the regulations qualifying for benefits. We will thus not assume that a score of 75 should be read as "70."

Given the plain and unambiguous wording of the statute, as well as the absence of a mandate in the regulations to consider error ranges where specific IQs are referenced and the other concerns detailed above, we find that the Commissioner properly refused to factor the possible measurement error in calculating Burns' IQ and that Burns, with an IQ of 75, does not meet or equalS 12.05.7 See also Howard v. Massanari, 255 F.3d 577, 582-83 (8th Cir. 2001) (holding that a claimant with an IQ score of 71

should not be "allowed the benefit of the mental retardation categorization"); Cockerham v. Sullivan, 895 F.2d 492, 495-496 (8th Cir. 1990) (refusing to give the claimant"the benefit of the doubt" and consider an IQ score of 71 presumptively to establish disability).

C.

Accordingly, we conclude that Burns is not per se disabled based on the record in its current state, and we will remand. But, in so doing, we address three related issues raised on appeal that have implications for the ALJ's consideration of the issues on remand.

_____

7. Burns also argues that the ALJ should have scheduled a supplemental hearing in order to receive testimony from a medical expert about whether Burns could establish medical equivalency to S 12.05. We reject this argument as well. In neither Dr. Laviolette's report nor anywhere else in the record is Burns diagnosed with mental retardation. In fact, Dr. Laviolette did not even conclude that Burns could not work. Rather, she stated that, for instance, in terms of occupational adjustment, Burns's would perform "fair, at best." While this is not a ringing endorsement of his ability to work, it is not a clear statement that he could not do so. In addition, S 12.05 requires that the claimant initially manifested deficient intellectual functioning before he turned twenty-two years old. In Williams v. Sullivan , 970 F.2d 1178, 1185 (3d Cir. 1992), we placed this burden on the claimant. Burns has not come forward with any proof of this sort. For these two reasons, it was reasonable for the ALJ not to have inquired further.

17

1. Conflict Between the Dictionary of Occupational Titles
        and the Testimony of the Vocational Expert

The Social Security Administration has taken administrative notice of the reliability of the job information contained in the Dictionary of Occupational Titles, referred to above, and often relies upon it at steps four and five of the evaluation process. See 20 C.F.R. 416.966(d) (2002). Burns argues that the vocational expert's testimony that he could work as a laundry sorter, packer, or ticket taker, adopted by the ALJ for his findings of fact, was inconsistent with the DOT in several respects, and that any inconsistencies should have been explained by the vocational expert as well as by the ALJ in his decision. We agree.

Many courts of appeals have opined as to the handling, on appellate review, of the situation in which there is an unexplained inconsistency or conflict between the DOT and the testimony of the vocational expert -- with mixed results and varying treatment.8 For two reasons, however, in this

_____

8. The courts of appeals for four circuits have held that an ALJ may base his conclusions on a vocational expert's testimony that conflicts with the DOT. See Carey v. Apfel, 230 F.3d 131, 146 (6th Cir. 2000) ("To the

extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT in this case, . . . the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so."); Jones v. Apfel, 190 F.3d 1224, 1229-1230 (11th Cir. 1999), cert. denied, 529 U.S. 1089 (2000) ("We agree with the Sixth Circuit that when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT."); Conn v. Secretary of Health & Human Servs., 51 F.3d 607, 610 (6th Cir. 1995) ("[T]he ALJ was within his rights to rely solely on the vocational expert's testimony."); Johnson v. Shalala, 60 F.3d 1428, 1435 (6th Cir. 1995) ("[A]lthough the DOT raises a presumption as to the job classification, it is rebuttable. We make explicit here that an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation."). The Court of Appeals for the Eighth Circuit, however, has held that an ALJ always must prefer the DOT over the testimony of a vocational expert, see Smith v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995) ("[W]hen expert testimony conflicts with the DOT, the DOT controls."), although the court seems to have quickly retreated from that bright-line rule. See Montgomery v.

18

instance we need not select from the alternatives chosen by the various courts. First, we will remand, and the ALJ can remedy the situation if it should arise again. Second, the Social Security Administration recently has issued a ruling that squarely addresses how this situation should be handled. See 20 C.F.R. S 402.35(b)(1) (stating that Social Security Rulings "are binding on all components of the Social Security Administration"). Social Security Ruling 00-4p requires that the ALJ ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and that, if the testimony does appear to conflict with the DOT, to "elicit a reasonable explanation for the apparent conflict." The Ruling requires that the explanation be made on the record and that the ALJ explain in his decision how the conflict was resolved. Thus, on remand, the conflicts that persist, if any, should be treated accordingly.

The record on appeal does reflect a number of conflicts between the vocational expert's testimony and the DOT that were not addressed by either the vocational expert or the ALJ. Because they could recur on remand, we address them.

_____

Chater, 69 F.3d 273, (8th Cir. 1995) ("The DOT classifications may be rebutted, however, with VE testimony which shows that 'particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform.' " (citation omitted)). Other courts of appeals have adopted a middle view. These courts require an ALJ to explain any decision to prefer the testimony of a vocational expert over the DOT. See Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999) ("[T]he ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability."); see also Mimms v. Heckler , 750 F.2d 180, 186 (2d Cir. 1984) ("Although both the ALJ in his opinion, and the vocational expert

in her testimony at the hearings, concluded that the claimant's vocational capacity was for sedentary, semi-skilled positions, the jobs selected by the expert and relied upon by the ALJ, as being appropriate, require the capacity to perform light work. Consequently, we must conclude that the Secretary failed to demonstrate the existence of substantial gainful employment of a sedentary nature, which the claimant was capable of performing."). See generally Donahue v. Barnhart, 279 F.3d 441, 445 (7th Cir. 2002).

19

Initially, Burns notes that the DOT does not list the job of "laundry sorter." See 1 United States Dep't of Labor, Dictionary of Occupational Titles S 361 et seq. (4th ed. 1991) ("Laundering Occupations"). He submits that even if the vocational expert meant to name the position of"laundry worker," this job is divided into laundry worker I, laundry worker II, and laundry worker III. See 1 Dictionary of Occupational Titles SS 361.685-014, 361.685-018, & 369.387-010. Both laundry worker I and II require the ability to do "medium work," and laundry worker III requires the ability to do "semi-skilled work." Thus, the vocational expert's testimony that he could work as a "laundry sorter" appears to conflict with the ALJ's finding that he could perform only light work that was unskilled.

We have reservations regarding Burns' argument. We have examined the DOT and note that, in addition to laundry worker I, II, and III, the job of "classifier" is listed with the sorting of laundry as its chief task. The DOT describes this job as involving only light, unskilled work. See 1 Dictionary of Occupational TitlesS 361.685-014. Accordingly, we are not convinced that the vocational expert meant to refer to either laundry worker I, II or III, and, therefore that his testimony necessarily conflicted with the DOT. On remand, this should be clarified, and any conflict explained in accordance with Ruling 00-4p, if the vocational expert adopts the same conclusion.

A similar dilemma exists in connection with the vocational expert's testimony that Burns could work as a "packer." As with "laundry sorter," we cannot find -- and counsel has not pointed to -- any job listed in the DOT under the specific title "packer." Rather, there are various types of "packers." For example, the DOT lists the jobs of "dental floss packer," S 920.687-082,"fish packer," S 920.687-086, "packer (tobacco)," S 920.687-130, and "packer, agricultural produce." S 920.687-134. These jobs require an ability to do work ranging from light to heavy, with the majority seeming to require medium work. Therefore, here it also is not clear whether the testimony of the vocational expert is consistent with the DOT. The ALJ asked the vocational expert to assume an ability to do light exertional work, but the vocational expert quite possibly

20

chose work that required a greater work capacity. Again, on

remand, this should be clarified, and any conflict explained
in accordance with Ruling 00-4p.

Burns makes an additional argument that his aptitude
level per se disqualifies him from any of the jobs specified
by the vocational expert based on the aptitude levels for
those jobs set forth in the DOT. He asserts that his IQ
score of 75 on the WAIS-R test places his aptitude level in
the lowest ten-percent of the population, and that,
according to the DOT, the jobs for which he was found
qualified require an aptitude level above the lowest ten-
percent of the population. Because we find no such levels
incorporated into the DOT, we reject Burns' argument.
While aptitudes are discussed in various occupational
handbooks, see, e.g., J. Michael Farr, et al., Guide for
Occupational Exploration (3d ed. 2001), aptitude levels are
not in the DOT or any other source of which the Social
Security Administration has taken administrative notice.
Therefore, the DOT and testimony of the vocational expert
was not necessarily inconsistent in this regard, so the duty
on the part of the ALJ to inquire into conflicts did not arise.9

2. Residual Functional Capacity Based on Physical
        Exertion Limitations

Burns also takes issue with the ALJ's determination of
his residual functional capacity based on his physical
exertion limitations -- i.e., his ability to work despite his
physical limitations -- contending that the ALJ's
determination was not supported by substantial evidence.
We disagree.10

In making disability determinations, the Social Security
Administration looks to see whether a claimant can perform
the physical exertion requirements of either his past
relevant work or jobs that exist in significant numbers in
the economy. The physical exertion requirements are

_____

9. Burns, however, is certainly free on remand to examine the vocational
expert based on the aptitude level required for a job as detailed in other
occupational handbooks.

10. We emphasize that this relates only to exertional aspects of Burns'
residual functional capacity.

labeled as sedentary, light, medium, heavy, or very heavy
work. 20 C.F.R. S 416.967 (2002). The ALJ determined that
Burns' exertional residual functional capacity enabled him
to engage in a "slightly reduced range of light work." Light
exertional work "generally requires the ability to stand and
carry weight for approximately six hours of an eight hour
day."11 Jesurum, 48 F.3d at 119 (citing Social Security
Ruling 83-10).

Basically, Burns asks us to reject the ALJ's findings
regarding residual functional capacity because he disagrees

with the emphasis the ALJ placed on those portions of his testimony regarding his subjective complaints of pain and his exertional limitations. If his testimony regarding his pain and limitations were credited fully, he argues, the ALJ could not have found him able to perform light exertional work.

We examine the ALJ's conclusions as to Burns' residual functional capacity with the deference required of the substantial evidence standard of review. The ALJ, nonetheless, must have evaluated all relevant evidence, Fargnoli v. Halter, 247 F.3d 34, 40-41 (3d Cir. 2001), and explained his reasons for rejecting any such evidence. Burnett v. Commissioner of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). He also must have given Burns' subjective complaints "serious consideration," Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993), and made specific findings of fact, including credibility, as to Burns'

---

11. The Social Security Administration has more fully defined the physical exertion requirements of "light work" in 20 C.F.R. S 416.967(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

22

residual functional capacity. Burnett, 220 F.3d at 120; see also Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).

Here, the ALJ complied with these mandates. He specifically addressed Burns' testimony regarding his pain and his limitations in the March 8, 2000 opinion. He found that the pain was not disabling and that Burns' testimony as to the impact of his impairments on his ability to work was "not fully credible."

Importantly, Burns does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be. Cf. Cotter, 642 F.2d at 706-07 (remanding to the ALJ to reconsider a denial of disability benefits because the ALJ's opinion did not address contradictory medical evidence). Instead, he notes only his testimony before the ALJ. As for pain, Burns did testify to experiencing various forms of pain, and the ALJ clearly addressed that testimony and did not reject Burns' allegations completely. As already mentioned, the ALJ found that Burns did suffer from chronic back pain.

Nevertheless, the ALJ noted that other parts of Burns' testimony, namely those addressing the number and type of activities he engages in on a daily basis, seemed to belie his assertion that the pain is disabling. In fact, as the ALJ noted, Burns specifically stated that he does not experience pain when he plays the drums. Likewise, Burns' testimony regarding his limitations does not seem consistent with other parts of his testimony. While he testified that he can only lift one pound and could not work an eight-hour day, he admittedly engages in activities -- most obviously, taking care of his four dogs and playing drums -- that require him to be able to lift more than a pound and to exert at least some effort.12 With this contradictory testimony and the lack of significant medical evidence or a medical opinion fully supporting his subjective assessment

_____

12. Further evidence that the ALJ did not ignore Burns' allegations of his own limitations is the fact that the ALJ expressly disagreed with the finding, made by the state agency, that Burns could do medium exertional work, and, instead, determined that Burns could do light exertional work at most.

23

of his limitations or complaints of pain, cf. Mason, 994 F.2d at 1067-68 ("Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."), we cannot say that substantial evidence did not support the ALJ's ruling or his rejection of parts of Burns' testimony as not fully credible. Cf. Van Horn v. Schweiker, 717 F.2d 871, 873-74 (3d Cir. 1983) (stating that an ALJ should note in his decision when he did not find a witness credible).

Accordingly, we will not disturb the ALJ's determination that Burns' exertional residual functional capacity enabled him to engage in light work.

3. Residual Functional Capacity as Affected by Stress
      and the Side Effects of Medication

According to Burns, the ALJ also erred in failing to take into account the fact of stress or the impact of the side effects of Burns' medication. We reject this argument as well.

The only reference to stress in the record is contained in Dr. Laviolette's report. Dr. Laviolette, however, does not document Burns' stress. Rather, the report mentions that Burns told Dr. Laviolette that he did not "feel like he could handle stress real well without the medication, and he feels the medication makes him drowsy." Burns urges that this mere mention of stress to Dr. Laviolette triggered a duty on the part of the ALJ to ask the vocational expert about the effects of the "limitations on Mr. Burns' ability to handle work stress." Burns cites to Social Security Ruling 85-15 as support of his argument. Although Ruling 85-15 does direct

an ALJ to consider nonexertional impairments, such as stress, in determining whether a person's residual functional capacity enables him to work, we do not believe, absent some medical evidence or diagnostic opinion, that either the statement made to Dr. Laviolette or the passing reference in Dr. Laviolette's report triggered an obligation to further inquire into stress as a disabling factor.

As for the side effects of the medication, the ALJ specifically addressed this issue in his opinion. Cf. Stewart v. Secretary of Health, Educ., & Welfare, 714 F.2d 287, 290

24

(3d Cir. 1983) (refusing to find that the ALJ's"implicit rejection" of the claimant's side effects was supported by substantial evidence where the ALJ gave no indication in his opinion that the issue was considered). In rejecting Burns' claim that he could not work due to the side effects of the medication he took -- namely drowsiness-- the ALJ noted that the record contained "no significant complaints of side effects from medication," that Dr. Laviolette noted that Burns did not, in fact, seem drowsy at the consultative examination, and that Burns did not seem drowsy at the administrative hearing. Likewise, there was no medical evidence as to any physical limitations resulting from any side effects from medication. Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations. Here, there is no such evidence. Thus, the ALJ's decision to discount Burns' allegations of side effects was based on substantial evidence.

V.

For the foregoing reasons, we will affirm in part, reverse in part, and remand to the District Court with instructions to return the case to the Commissioner for further proceedings in accordance with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

25