

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-16-2004

# Moody v. Comm Social Security

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3246

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Moody v. Comm Social Security" (2004). *2004 Decisions.* Paper 133.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/133

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3246

DARRELL L. MOODY

v.

JO ANNE B. BARNHART,
COMMISSIONER

Darrell Moody,
Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 02-cv-08972)
District Judge: Clarence C. Newcomer

Submitted Under Third Circuit LAR 34.1(a)
June 22, 2004

Before: Nygaard, McKee and Chertoff
Circuit Judges

(Opinion filed:  November 16, 2004)

OPINION

McKee, Circuit Judge.

Darrel Moody appeals his denial of Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. § § 401-433.  For the reasons that follow, we

will affirm.

**I.**

Moody filed applications with the Social Security Administration for Supplemental Security Income benefits and Disability Insurance Benefits claiming both mental and physical disabilities as of April 10, 2000. When the agency denied his application, he filed for an administrative hearing. After hearing testimony from a vocational expert and a non-treating physician, the administrative law judge determined that Moody was not disabled under 20 C.F.R. § 404.1520(f). (R. 8).

The ALJ's decision became the final agency decision of the Commissioner when the Appeals Council found no basis for reviewing it. *Sims v. Apfel*, 530 U.S. 103, 106-107 (2000), 20 C.F.R. § § 404.981, .900(a)(4)-(5). Thereafter, the district court granted the Commissioner's motion for summary judgment thereby concluding that the ALJ's decision was supported by substantial evidence. This appeal followed.

We have jurisdiction under 28 U.S.C. § 1291. We must determine if the district court was correct in concluding that the Commissioner's decision was supported by "substantial evidence." Substantial evidence is that a properly reasoning person would accept as sufficient to support a conclusion. It is more than a scintilla, but somewhat less than a preponderance of the evidence. *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971).

**II.**

"Disability" is defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423 (d)(1)(A). In order to be eligible for disability benefits, a claimant must show that their:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .

42 U.S.C. § 423 (d)(2)(A).

A five-step analysis is used to determine disability. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999), 20 C.F.R. § 404.1520(a)(4). In Step 1, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. If the claimant is *not* involved in such activity, the Commissioner continues to Step 2 and determines if the claimant suffers from a *severe impairment*.[1] If the claimant does, the Commissioner will then evaluate the impairment at Step 3 to see if it equals or exceeds a listed impairment in Appendix 1 of the Regulations. If the claimant's impairments are *not* comparable to those listed in the Regulations, the Commissioner will go on to Step 4 to

---

[1]"Severe impairment" is defined as any impairment or combination of impairments which significantly limits an individual's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c).

determine if the claimant is capable of performing his/her past relevant work ("residual functional capacity") considering the impairment. If the claimant is deemed *not* capable of performing his/her past work, the Commissioner moves on to Step 5 to determine if the claimant is capable of performing other available work consistent with the claimant's age, medical impairments, residual functional capacity and past work experience.

The ALJ found that Moody had two severe physical impairments but no mental impairment at Step 2 of the process. Moody's impairments were not contained in any listings at Step 3, but the ALJ determined that Moody could not perform any of his past relevant work at Step 4. At Step 5 the ALJ concluded that Moody was capable of performing sustained work as a data entry worker and customer service worker and was therefore not be disabled.

## III.

Moody was 48 years old on June 30, 2000, the date he was last insured.[2] He was honorably discharged from the marines after serving from 1970 to 1974. Following his discharge, Moody held various positions including telephone operator, a state store clerk for the Pennsylvania Liquor Control Board, and a part time assistant in the Philadelphia Community College computer lab. He received an associates degree in business programming in 1992. Immediately prior to his disability claim he was a part time stock

---

[2]In order for a claimant to be entitled to DIB, he/she must show that his impairment became disabling prior to his last insured date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B), 20 C.F.R. § 404.101(a), .131(a) (2001).

4

clerk for Eckerd Drugs where he lifted boxes and occasionally mopped.  He stopped working after he developed severe pain in his lower back and left leg.  Moody also has a history of drug and alcohol abuse.  (R. 160).

## A. Physical impairments

Moody was first seen for his back and leg pain at a hospital emergency room on April 10, 2001.  A couple of weeks later, he was seen by his primary care physician, Antonette Kruc, D.O., who prescribed Voltaren, Zydone, and Soma.   A subsequent MRI of Moody's lumbar and thoracic spine showed a "large paramidline herniated nucleus pulposus (ruptured or prolapsed intervetebral disk) at L5-S1 and a small disc bulge at L4-L5.

Moody applied for disability benefits on July 28, 2000 alleging disability as of April 14, 2000.  On October 31, 2000 Pushpa Thakarar M.D., a state agency consulting physician, examined Moody.  Dr. Thakarar found that Moody had a full range of motion, and good sitting and standing balance, but diagnosed him with chronic low back pain, history of sciatica and post-traumatic stress disorder.  Dr. Thakarar concluded on a Medical Source Statement of Claimant's Ability to Perform Work Related Physical Activities that Moody could frequently lift, and occasionally carry, 20 pounds.  The doctor also concluded that Moody could stand and walk for 3-4 hours and sit for 8 hours, had limited ability to push and pull in the lower extremities, and could frequently perform postural activities, but should avoid humidity and wetness.  (R. 171-173).

In May, 2001, Moody was diagnosed with diabetes mellitus, aspiration pneumonia, hypertension and bipolar disorder during a hospitalization. (R. 210). He also tested positive for opiates, and was released on June 7 for acute rehabilitation. When released, Moody was instructed about long-term care of his diabetes and told to follow up for his blood pressure. (R. 265).[3]

## B. <u>Mental Health History</u>

According to his disability report, Moody was treated for depression at The Wedge two and a half years before he applied for disability benefits. (R. 117). On July 27, 2000 during a visit to his primary care physician, Dr. Kruc, Moody reported that he was depressed, anxious and had homicidal thoughts. Dr. Kruc prescribed Zoloft and Xanax to treat post traumatic stress disorder. (R. 151).

Charles Johnson, a state agency psychologist, evaluated Moody on October 25, 2000 and diagnosed him as having an Adjustment Disorder with depressed mood and Impulse Control Disorder (provisional). In an activities assessment, Dr. Johnson noted that Moody had fair ability to perform most work related activities. According to Dr. Johnson, Moody had poor or no ability to interact with supervisors, deal with work related stress, or understand, remember, and carry out complex job instructions. (R. 163-64).

---

[3] Subsequent medical records from October 25, 2001 to the April 2002 hearing are missing (Appellant's Br. 8) and were not part of the record.

Roger K. Fretz, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique Form on November 20, 2000. Dr. Fretz found that Moody had an adjustment disorder with depressed mood (R. 176), and noted his history of post traumatic stress disorder. (R. 178). When rating Moody's functional limitations in light of these disorders, he concluded Moody had mild restriction of "activities of daily living" and moderate difficulties in maintaining social function and concentrating. However, none of these limitations satisfied the functional criterion. (R. 183). Dr. Fretz noted that many of Moody's concerns were physical and concluded that Moody was not "wholly credible." (R. 186). Dr. Fretz did not agree with Dr. Johnson's conclusions regarding Moody's limitations (his ability to handle authority and work stresses): Dr. Fretz concluded that "the record does not support a severe limitation of function in these areas." (R. 189).

Moody began treatment in January 2001. Dr. Leon Robinson completed an initial evaluation of Moody and diagnosed a bi-polar disorder and an avoidant personality disorder (R. 208). Dr. Robinson stated that Moody described symptoms that met the description of mania and major depression. (R. 204-205). He prescribed three different medications. The dosage was adjusted throughout the year.

## C. <u>Administrative Hearing Testimony</u>

At Moody's administrative hearing, Richard W. Cohen, M.D. testified as an independent medical advisor based on his review of the medical evidence in Moody's medical records. Dr. Cohen testified that Moody did not have any severe mental

7

impairments. (R. 65). Specifically, Dr. Cohen concluded that:

- he could not diagnose bipolar disorder because there was insufficient evidence of manic episodes and major depression. (R. 55,60);
- the evidence of irritability could be caused by the medications that Moody was taking. (R. 55, 58, 59);
- he also could not diagnose a major affective disorder, periodic explosive disorder, post traumatic stress disorder (no symptoms) or paranoia. (R. 56, 62);
- an adjustment disorder is not an axis one psychiatric diagnosis; there is no place to put it on the disability form. (R. 56, 58);
- Moody has no marked functional limitations (R. 59)

A vocational expert also testified and concluded that Moody's skills would be transferable to sedentary positions such as data entry or customer service.

## IV. DISCUSSION

Moody asserts that: 1) there is insufficient evidence to support the ALJ's finding of no mental impairment at Step 2; 2) the ALJ erred in assessing the medical and testamentary evidence; 3) the ALJ erred in assessing Moody's residual functional capacity; and 4) the Commissioner did not meet the burden of proof at Step 5 of the sequential evaluation process. We disagree.

The ALJ did not conclude that Moody had a mental impairment because she was relying on Dr. Cohen's evaluation of the Moody's medical records. Dr. Cohen testified that after evaluating the medical evidence, he could not *diagnose* any categorically recognized severe mental impairment. The ALJ considered the "diagnoses" of Moody's treating physicians cited in his brief (App. Br. 21-22), but she dismissed them because they were not supported by sufficient evidence of a mental impairment.

8

Moody also asserts that the ALJ erred at Step 2 of the sequential evaluation process because she did not properly evaluate the medical evidence, including Moody's symptoms and the limiting effects of his impairments. However, the absence of an exhaustive listing of all of Moody's symptoms in the ALJ's opinion does not constitute reversible error. The regulation that Moody himself cites states that "[a] physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, *not only your statement of symptoms.* 20 C.F.R. § 404.1508 (emphasis added). The ALJ relied on the Dr. Cohen's evaluation of the medical evidence, including Moody's symptoms. Dr. Cohen concluded that there were no marked functional limitations (R. 59), and that some of Moody's symptoms were likely attributable to his prescribed medications. (R. 55).

Moody cites *Bailey v. Sullivan,* 885 F.2d 52 (3d Cir. 1989), for the proposition that a claimant need only make a d*e minimis* showing of a severe impairment at Step 2 of the sequential evaluation. 885 F.2d at 57. However, the language Moody relies upon is *dicta.* Moreover, even if it were not, we would still find that Moody failed to satisfy his burden.

Moody also argues that the ALJ should have considered the combination of his impairments to find a severe mental impairment. Applicable regulations and case law cited by Moody refers to the determination of the residual functional capacity at Step 4 of the sequential evaluation process, and not to the finding of a severe impairment.

Moody next asserts that the ALJ did not properly assess the medical and

9

testamentary evidence. However, the record suggests otherwise. The ALJ *did* refer to Moody's weekly therapy sessions and to his prescribed medications, (R. 21), and she *did* describe findings from some of Moody's treating sources (the Consortium and Dr. Johnson) in her opinion. (R. 20). The remaining sources that Moody lists to support his contention that the ALJ "failed to discuss,"(Appellant's brief 30-32), is not the type of "objective medical evidence" that was discussed in *Burnett v. Commissioner,* 220 F.3d 112, 122-23. There, the ALJ neglected to include the appropriate diagnoses. We agree that the ALJ could have been more explicit regarding Moody's treating physician. She merely stated: "I have considered Dr. Johnson's assessment but I do not accord it much weight." (R. 20). Nevertheless, we do not engage in *de novo* review and there is substantial evidence to support her conclusion.

Moody also asserts that the ALJ did not properly weigh and consider his mental health treatment and she should not have relied upon Dr. Cohen. However, the ALJ did not err in relying upon Dr. Cohen's professional opinion. Although it is true that treating physicians are generally given more weight, an ALJ is not foreclosed from relying upon a non-examining physician's opinion. 20 C.F.R. § 404.1527(d). The Regulations allow the ALJ to rely upon medical opinions and specifically provide that "all evidence from nonexamining sources [is] opinion evidence." 20 C.F.R. § 404.1527(f). Moody cites *Morales v. Apfel* for the proposition that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

counterveiling evidence." 225 F.3d at 317 (3d Cir. 2000). However, Moody fails to realize that there was a contradiction *among his treating sources* (specifically Dr. Johnson and Dr. Fretz), and the ALJ heard and accepted Dr. Cohen's evaluation of Moody's medical record. *Apfel* also states: "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Id.* Here, the ALJ did not reject Moody's treating sources for no reason or the wrong reason as was the case in *Apfel* where the ALJ relied on her own perceptions of the claimant. Instead the ALJ here relied upon Dr. Cohen's opinion. Dr. Cohen's opinion considered the "pertinent evidence" including opinions of Moody's treating physician as well as other examining sources. 20 C.F.R. § 404.1527(d)(3). In fact, Dr. Cohen specifically referred to supporting information in Moody's medical file during his testimony.

Moody next argues that the ALJ should have contacted Moody's treating psychiatrist, Dr. Robinson. We disagree. 20 C.F.R. § 404.1512(e)(1) states that an ALJ should contact a medical source when their report "contains a conflict or ambiguity that must be resolved," or when "the report does not contain all the necessary information." This is not the case here because there was sufficient evidence in the medical records for the ALJ to make her decision.

Moody also asserts that the ALJ erred in Step 4 of the sequential evaluation process and the residual functional capacity finding. Specifically, Moody argues that the

residual functional capacity that the ALJ adopted was improper because it was made by a non-physician (nonexamining disability claim adjudicator), and it deviated from the residual functional capacity completed by the state agency treating physician Dr. Thakarar. We again disagree.

The ALJ concluded that, based on his residual functional capacity, Moody could not perform his past relevant work. Moody could, however, perform some sedentary work[4] given his vocational profile and the availability of sedentary jobs in the national and local job market.  In fact, the ALJ was more generous in her findings of Moody's limitations than Dr. Thakarar.  The ALJ concluded that Moody could occasionally lift 10 pounds, stand and walk for 2 hours a day, sit for 6 hours a day, had an unlimited ability to push and pull and could occasionally climb, balance, stoop and kneel although he could not crouch or crawl.  (R. 22).  Dr. Thakarar reported that Moody was capable of more. Dr. Thakarar thought Moody could frequently lift up to 20 pounds, could stand and walk three to four hours per day, and sit for eight hours a day.  Moody wants us to accept other limitations not included in the examiner's report such as the need to alternate sitting and standing, limits on pushing with the lower extremities, and certain environmental limitations.  However, those limitations do not negate the substantial evidence that

---

[4]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  20 C.F.R. §§ 404.1567(a) and 416.967(a).

Moody can perform sedentary jobs.[5]

Finally, Moody asserts that the Commissioner did not meet his burden of proof at Step 5 because the ALJ's vocational hypothetical questions were "legally insufficient."

The ALJ noted and recognized this burden in her opinion. (R. 22). Moody cites *Burns v. Barnhart,* 312 F.3d 113 (3d Cir. 2002), to support his claim that the ALJ's hypothetical questions were improper because they failed to include all of Moody's physical and mental impairments. In *Burns* we noted that if "*undisputed evidence* of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." 312 F.3d 113, 123 (3d Cir. 2002) (emphasis added). In addition, in *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987), we noted that the ALJ need only include those limitations that are supported by evidence of record. This record contains substantial evidence to support the ALJ's conclusion that Moody did not have a severe mental impairment. Therefore, the ALJ's hypothetical questions were not improper.

## V. CONCLUSION

For the reasons set forth above, we will affirm the district court's order upholding the Commissioner's determination of no disability.

---

[5] Moody was not found to have a substantial mental impairment.