Ronald DIEHL, Plaintiff,

v.

Jo Anne BARNHART, Commissioner
of Social Security, Defendant.

Civ.A. No. 03–4835.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 2005.

.Michael Patrick Boyle, Philadelphia, PA, for Plaintiff.

Eda Giusti, Nicholas R. Cerulli, William Brian Reeser, Social Security Administration Office of The General Counsel, Philadelphia, PA, for Defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Plaintiff, Ronald Diehl, brings this action under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration denying Plaintiff's claim for Disability Insurance Benefits. Before the Court are the parties' cross motions for summary judgment, a Report and Recommendation of the Magistrate Judge recommending that the Court grant Defendant's motion and deny Plaintiff's motion, and Plaintiff's objections to the Magistrate Judge's Report and Recommendation.

Plaintiff has raised a multitude of objections to the Magistrate Judge's Report and Recommendation. In particular, he alleges that the Magistrate Judge erred in: (1)

ruling that the Administrative Law Judge ("ALJ") did not err by failing to consult a medical expert at the hearing to determine whether the combination of Plaintiff's impairments met or equaled a listed impairment independent of drug and alcohol use; (2) ruling that the ALJ did not fail to comply with Social Security Ruling 00–4p; (3) adopting the ALJ's finding that Plaintiff is literate; (4) failing to address Plaintiff's argument that the ALJ erred by failing to properly consider Plaintiff's ability to deal with stress; (5) adopting the ALJ's finding that Plaintiff has the residual functional capacity to perform light work; (6) failing to address Plaintiff's argument that the ALJ erred by failing to consider the full impact of Plaintiff's emotional impairments and to evaluate all evidence before her; and (7) adopting the ALJ's finding that Plaintiff's statements concerning his impairments are not totally credible.

For the reasons that follow, the Court will sustain objections 1 and 3, overrule with prejudice objections 2 and 4, and overrule without prejudice objections 5, 6 and 7. The case shall be remanded to the Commissioner of the Social Security Administration for further proceedings consistent with this Opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Ronald Diehl was born on August 10, 1957. (R. at 83.) At the time of the administrative hearing, Diehl was forty-five (45) years old. (R. at 39.) He completed the twelfth grade (R. at 42), and has past work experience as a painter, forklift operator, carpet cutter (R. at 44–45), and landscaper (R. at 106).

Diehl filed for disability benefits on December 14, 2001 alleging onset of disability as of July 14, 1999 resulting from depression, bipolar disorder, polysubstance disorder and inability to concentrate and/or maintain his mood or energy level enough to work. (R. at 97.) Diehl also sustained an injury in July of 1999 (R. at 130, 218) when he fell through a plate glass window (R. at 162), which left him with limited use of his right hand (R. at 130, 162). His claim was denied initially (R. at 72–73) and Plaintiff requested a hearing before an ALJ. After a hearing, ALJ Margaret A. Lenzi denied Diehl's claim for benefits on January 27, 2003. (R. at 29.) The Appeals Council subsequently denied Diehl's request for review of the ALJ's decision (R. at 5) and the Commissioner adopted the Appeal's Council's decision, making the ALJ's decision the final decision of the Commissioner. Diehl then filed the instant action in this Court on August 26, 2003.

## II. DISCUSSION

### A. *Standard of Review*

The Court's review of the Magistrate Judge's Report and Recommendation is de novo. 28 U.S.C. § 636(b). Therefore, the Court "may accept, reject or modify, in whole or in part," the Magistrate Judge's findings and recommendations.

With respect to the decision of the ALJ, the role of a the Court is to determine whether the ALJ's decision is supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). "It is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of Health & Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

██ The search for substantial evidence "is *not* merely a quantitative exercise." *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983). Rather the "administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir.1981), *reh'g denied,* 650 F.2d 481 (3d Cir.1981). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent,* 710 F.2d at 114.

## B. *Establishing Eligibility Under the Social Security Act*

To establish a right to Disability Insurance Benefits, a claimant must show that he suffers from a disability as defined under the Social Security Act. The Social Security Act defines disability as a medically determinable physical or mental impairment that prevents the claimant from engaging in any "substantial gainful activity" for a continuous twelve-month period. 42 U.S.C. § 423(d)(1)(A). The impairment must be so severe that the claimant "is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

██ The Commissioner has established a five-step inquiry for determining whether a claimant is eligible for disability benefits under the Act. To prevail, a claimant must establish (1) that he is not engaged in substantial gainful activity, and (2) that he suffers from a severe impairment. *See Jesurum,* 48 F.3d at 117 (citing *Bowen v. Yuckert,* 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). If the claim-

ant shows these two elements, the Commissioner determines (3) whether the impairment is listed by the Secretary as one creating a presumption of disability. *Id.* If the claimant's medical impairment is not "listed," the claimant bears the burden of proving that (4) the impairment nonetheless prevents him from performing work that he has performed in the past. *Id.* The relevant inquiry is "whether the claimant retains the residual functional capacity to perform [his] past relevant work." *Fargnoli v. Massanari,* 247 F.3d 34, 39 (3d Cir.2001). If the claimant satisfies this burden, the Secretary must grant him benefits unless the Secretary can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Jesurum,* 48 F.3d at 117 (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir. 1985)).

## C. *The ALJ's Decision*

After considering evidence of Plaintiff's physical and mental impairments and of Plaintiff's educational background, the ALJ concluded at step two of the sequential analysis that Plaintiff "is bipolar,[1] has polysubstance abuse and dependence, borderline intellectual functioning, right hand median nerve axonopathy[2] and left forearm hyposensitivity radial neuropathy, impairments that are severe within the meaning of the regulations." (R. at 28.) The ALJ further concluded at step three that when under the influence of drugs or alcohol, the severity of Plaintiff's mental impairments meet the requirements of Listings 12.04 and 12.09 in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) However, the ALJ also concluded that once drugs and alcohol are no longer con-

---

1. Bipolar means "pertaining to mood disorders in which both depressive episodes and manic or hypomanic episodes occur". *Dorland's Illustrated Medical Dictionary* 214 (29th ed.2000) (hereinafter *"Dorland's"*).

2. Axonopathy is "a disorder disrupting the normal functioning of the axons." *Dorland's* at 181.

sidered, Plaintiff's impairments do not meet or equal criteria of any listed impairment. *Id.* Therefore, the ALJ reached step four of the sequential analysis and found that Plaintiff is not able to perform any of his past relevant work. *Id.* Nevertheless, the ALJ concluded at step five, with the guidance of a vocational expert who testified at the hearing, that Plaintiff "has the residual functional capacity for light work provided it allows for occasional use of the right hand for simple grasping, fine manipulation and push/pulling and occasional climbing and perform[ing] other postural activity frequently and can follow simple routine instructions with limited ability to read and write." *Id.* Further, the ALJ concluded that although Plaintiff is not able to perform the full range of light work, "there are a significant number of jobs in the national economy that he could perform." (R. at 28–29.) Consequently, the ALJ concluded that Plaintiff was not disabled. (R. at 29.)

### D. *Medical and Vocational Evidence*

The relevant evidence in this case consists of voluminous medical reports, and the testimony of both Diehl and a vocational expert. The evidence is summarized below.

On July 26, 1999, Diehl suffered multiple lacerations to his arms when he fell through a plate glass window while working. (R. at 130, 162, 218.) As a result, he was hospitalized for two weeks and underwent several surgeries. (R. at 162.)

On January 10, 2000, Plaintiff submitted to an electromyography ("EMG") and nerve conduction studies which showed a "severe, near-complete right median neuropathy at the wrist[,] a complete left superficial radial neuropathy[, and] a mild left median neuropathy localized to the wrist with mild ongoing axon loss." (R. at 218–20.) Diehl continued to report "severe dysenthesias/pain in the median nerve

distribution in the right hand," as of August 8, 2000 and he entered into a program of occupational hand therapy. (R. at 304–13.)

On January 5, 2001, Bruce Grossinger, D.O., evaluated Diehl in neurological and EMG consultation. Dr. Grossinger concluded that Diehl had a "severe partial right median axonopathy, as well as a left moderate radial neuropathy at the level of the forearm." (R. at 132.) Dr. Grossinger added that Diehl continued to have "abundant neurological deficits." *Id.*

Upon referral from Dr. Grossinger, Diehl was given a functional assessment at Community Rehab Centers on February 9, 2001 based upon grip dynamometer graphing, resistance dynamometer graphing, pulse variations, weights achieved, and selectivity of pain reports and pain behaviors. (R. at 268–75.) Christopher F. Nasta, B.S., an assessment specialist, reported that Diehl's "[p]hysical capabilities were limited secondary to reports of pain, soreness, and pulling in his right arm as well as pulling and soreness in the left arm and forearm." (R. at 268.) Notably, Mr. Nasta reported that with his right hand pronated (palm down) and left hand supinated (palm up), Diehl was able to use his right hand to hold a bolt down while he screwed in the nut with his left hand. (R. at 274.) Mr. Nasta ultimately concluded that Diehl's performance "demonstrated a recommended workday tolerance of 8 hours functioning at the [s]edentary deman[d] level according to the Department of Labor guidelines," with his "primary functional limitation" relating to activities that involve the use of Diehl's upper extremities. (R. at 268.)

On July 10, 2001, Diehl was seen by Guy M. Nardella, Jr., M.D. after complaining of pain at the palmar surface of his right thumb. (R. at 193.) Dr. Nardella reported that Diehl's right grip strength was

approximately 50% of the left hand. *Id.* Dr. Nardella prescribed Vicoden to treat Diehl's pain, and Restoril for sleep, and he recommended that Diehl follow through with chronic pain therapy with Dr. Grossinger. *Id.*

In addition to Diehl's physical impairments, the administrative record documents Diehl's mental and psychological impairments. From October 29, 2001 through November 14, 2001, Diehl was an inpatient at the Mirmont Treatment Center for treatment of polysubstance abuse, with cocaine being Diehl's drug of choice, major depressive disorder, and dysthymic disorder. (R. at 142.) Diehl's Global Assessment of Functioning score was 45.[3] *Id.* Richard Silver, M.D., reported that Diehl was discharged in stable physical and emotional condition and transitioned into Mirmont's intensive outpatient program. (R. at 144.) According to Dr. Silver, Diehl "demonstrated a high degree of motivation through his active participation in therapeutic activities, completion of all treatment plan goals, and formulating a sound aftercare plan." *Id.*

On December 31, 2001, a month and a half after discharge from the Mirmont Treatment Center, Diehl submitted to a psychiatric evaluation at Northwestern Human Services of Delaware County. (R. at 152.) Usha Kasturirangan, M.D., performed the evaluation and indicated that Diehl reported a longstanding diagnosis of bipolar affective disorder, auditory halluci-

nations since age 16, alcohol use since age 8, and excessive drinking in the past. *Id.* Dr. Kasturirangan diagnosed Diehl with schizoaffective disorder[4] and gave him a Global Assessment of Functioning score of 50. (R. at 154.) Dr. Kasturirangan recommended day hospital treatment, which Diehl refused, resumption of medication, and individual therapy. (R. at 154–55.)

Another psychiatric evaluation was performed at Northwestern Human Services of Delaware County on April 18, 2002 by Nwe Oo, M.D. (R. at 257.) Dr. Oo indicated that Diehl had been attending AA and NA meetings almost every day. *Id.* Dr. Oo also noted that Diehl reported that he has been depressed with rapid mood swings since childhood. *Id.* Diehl also reported to Dr. Oo that his mother committed suicide when he was a child and that he was subject to physical and verbal abuse by his father. *Id.* Dr. Oo pointed out the Diehl reported a history of anger outbursts, irritability, alternating with depressed mood for years. *Id.* Dr. Oo diagnosed Diehl with bipolar disorder, current episode depressed, and cocaine dependence in early full remission. (R. at 259.) Dr. Oo assigned Diehl a Global Assessment of Functioning score of 60. *Id.* Dr. Oo recommended that Diehl continue attending AA and NA meetings, pursue individual therapy, increase his dose of Wellbutrin, take Trazadone for insomnia, and

---

3. The Global Assessment of Functioning ("GAF") Scale is used to report and track the psychological, social, and occupational functioning of an individual. *American Psychiatric Association, Diagnostic and Statistical Manual* 32 (4th ed.2000) (hereinafter *"DSM–IV"*). The GAF scale is reported on a scale of 0 to 100. *Id.* at 33–34. A score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning

(e.g., no friends, unable to keep a job)." *Id.* at 34.

4. Schizoaffective disorder is a "mental disorder in which a major depressive episode, manic episode, or mixed episode occurs along with prominent psychotic symptoms characteristic of schizophrenia, the symptoms of the mood disorder being present for a substantial portion of the illness, but not for its entirety, and the disturbance not being due to the effects of a psychoactive substance." *Dorland's* at 531.

start on Neurontin for mood instability. *Id.*

Less than a month after his evaluation at Northwestern, Diehl submitted to a disability examination conducted by Frederic Kwapien, M.D., of the Pennsylvania Bureau of Disability Determination on May 1, 2002. (R. at 156.) According to Dr. Kwapien, the onset of Diehl's emotional illness dates back to age 7 when he viewed his mother commit suicide. *Id.* Dr. Kwapien also indicates that Diehl reported that his father was an alcoholic and that Diehl himself began drinking alcohol at age 7. *Id.* Diehl reported using other drugs such as marijuana and cocaine. *Id.* Further, Diehl estimated that he had been in eight different rehabilitation facilities. *Id.* At the time of Diehl's examination, he reported that he had been "clean and sober" for about eight months. *Id.*

Upon review of Diehl's mental status, Dr. Kwapien reported that Diehl was oriented, alert, and had intact memory with no significant impairment of other mental faculties. (R. at 157.) Dr. Kwapien further remarked that Diehl's affect is in a fairly good range but that his mood varies, going from high to a low level. *Id.* Diehl's speech was relevant, coherent, and goal-directed. *Id.* Dr. Kwapien found no evidence of "bizarre ideation, delusions, paranoia or hallucinations." *Id.* Dr. Kwapien remarked that Diehl's judgment in the context of the interview is "fairly good," but that his insight is partial only. *Id.* Ultimately, Dr. Kwapien diagnosed Diehl with "bipolar I disorder, depressed, in partial remission," alcohol abuse and cocaine abuse. *Id.*

Diehl was also rated by Dr. Kwapien in terms of his ability to make occupational, performance, and personal-social adjustments. With respect to ability to make occupational adjustments, Dr. Kwapien rated Diehl as having "good" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, function independently, and maintain attention/concentration, and "fair" ability to deal with work stresses. (R. at 159.) With respect to making performance adjustments, Dr. Kwapien rated Diehl as having "unlimited/very good" ability to understand, remember, and carry out simple job instructions, and "good" ability to understand, remember and carry out complex job instructions and to understand, remember and carry out detailed, but not complex job instructions. *Id.* Finally, with respect to ability to make personal-social adjustments, Dr. Kwapien rated Diehl as having "good" ability to maintain personal appearance and to relate predictably in social situations, and "fair" ability to behave in an emotionally stable manner and to demonstrate reliability. (R. at 160.)

On June 13, 2002, Walter Schwartz, D.O., performed an examination of Diehl. In a report addressed to the Pennsylvania Bureau of Disability Determination, Dr. Schwartz documented Diehl's history noting that Diehl ceased working in 1999 when he injured his left arm and right wrist. (R. at 162.) Dr. Schwartz reported that Diehl's injury left him with "paresthesias in the left hand and involving the lower arm and third, fourth, and fifth fingers," and "marked reduction in the range of motion in the right hand." *Id.* Dr. Schwartz also noted that Diehl has a family history of drug abuse, that Diehl's mother was suicidal, and that Diehl had a history of being bipolar. *Id.*

Dr. Schwartz summarized his report concluding that Diehl suffered from long term abuse of alcohol and cocaine, though he had not done so in the previous three months. (R. at 164.) Dr. Schwartz opined that Diehl was depressed and he noted that a psychiatrist diagnosed Diehl with bipolar disorder. *Id.* Dr. Schwartz further

opined that Diehl was "severely restricted with the use of his right hand as far as grip and dexterity." *Id.* Specifically, he noted that his grip was 1/5 with his right hand and dexterity in that hand was very poor. (R. at 163.) Dr. Schwartz noted that Plaintiff's range of motion of the right wrist is significantly reduced. *Id.* Other than hyposensitivity, Dr. Schwartz opined that Diehl's left hand seems to be functioning well. (R. at 164.)

Dr. Schwartz also completed an Ability to Perform Work–Related Activities form. He opined that Diehl had no limitations walking, sitting, and standing. (R. at 165.) Due to the injury to his right hand, however, Dr. Schwartz opined that Diehl had the occasional ability to lift or carry 20 pounds, and that he was limited in his ability to push, pull, reach, handle, finger, and feel. (R. at 165–66.)

On July 11, 2002, Paul Perch, Ed.D., completed a Mental Functional Capacity Assessment survey for Diehl. (R. at 167–84.) Dr. Perch found Diehl to be "moderately limited" in ability to understand, remember, and carry out detailed instructions and in ability to respond appropriately to changes in the work setting. (R. at 167–68.) Diehl was rated as "not significantly limited" in all other subcategories pertaining to understanding and memory, sustained concentration and persistence, social interaction, and adaption. *Id.*

In December of 2002, Peter J. McCusker, a psychologist, evaluated Diehl upon referral from the Rosemont Office of Vocational Rehabilitation. (R. at 224–28.) Dr. McCusker concluded in his report that Diehl's greatest problems are emotionally-personality based. (R. at 229.) According to Dr. McCusker, Diehl evidences "pressured speech, severe depression, anxiety, impulsivity, and impatience." (R. at 229.) Dr. McCusker also noted that Diehl exhibited "major self-control difficulty" and "behaved with much intensity in language and action." *Id.* Dr. McCusker further noted that Diehl's ego and self-esteem seemed very fragile, that he had much trouble with frustration tolerance and ability to delay, and that he tended to catastrophize what one would usually regard as everyday stressors. *Id.* Diagnostically, Dr. McCusker concluded that Diehl evidences bipolar disorder, polysubstance dependence, and borderline personality disorder [5] and that intensive psychiatric treatment is imperative. (R. at 229.)

Dr. McCusker also noted in his report that Diehl described longstanding learning problems and that Diehl failed the first and sixth grades. (R. at 225.) Dr. McCusker tested Diehl's cognitive abilities. He administered the Wechsler Adult Intelligence tests and reported a verbal IQ score of 69, performance IQ of 77, and a full scale IQ of 70. (R. at 226.) Dr. McCusker interpreted the results to mean that Diehl "currently functions within the lowest limits of the Borderline range of intelligence with Verbal I.Q. slightly weaker than Performance I.Q." *Id.* Assessment of basic perceptual-motor functioning yielded a finding of mildly impaired motor planning and fine motor abilities. (R. at 227.) On the other hand, Dr. McCusker concluded that Diehl's attention for numerals and mental calculation are slight relative strengths and that attention to visual detail is a more noteworthy strength. (R. at 228.) Dr. McCusker also concluded that Diehl's visual scanning skill and memory

---

5. Personality disorders are "a category of mental disorders characterized by enduring, inflexible, and maladaptive personality traits that deviate markedly from cultural expectations, are self-perpetuating, pervade a broad range of situations, and either generate subjective distress or result in significant impairments in social, occupational, or other functioning." *Dorland's* at 531.

functioning—both verbal and nonverbal—are better than one would expect based on IQ. *Id.* In the achievement area, Diehl scored very poorly in word recognition and spelling to dictation on the Wide Range Achievement Test 3rd ("WRAT"). *Id.* Diehl's raw score in word recognition (*i.e.*, reading) was 62 placing him at the first percentile and at a 3rd grade reading level. *Id.* His raw score in spelling was 57 placing him at a .5 percentile and at a 2nd grade level. *Id.* With respect to basic arithmetic computation, Dr. McCusker concluded that Diehl is adequate at performing addition, subtraction, and multiplication of whole numbers. *Id.* Overall, Dr. McCusker concluded that Diehl is "readily intimidated by cognitive and other performance tasks," and that "[h]e would require intensive social-emotional support in any training or employment setting, especially while he acclimates to it." (R. at 229.)

At the administrative hearing, Diehl testified that he was placed in special education classes while in school and that he has difficulty with reading, writing, spelling and comprehension. (R. at 42–43.) Moreover, he has tried to read the newspaper, but has trouble comprehending what he is reading. (R. at 42.) His difficulty comprehending written material is a source of frustration for Diehl. (R. at 42.) His previous employment did not require him to read anything but numbers. (R. at 43.)

With respect to psychiatric impairments, Diehl testified that he is depressed and that he needs a lot of counseling because of his "background where [he] came from." (R. at 45.) According to Diehl, he has tried counseling many times and then stopped. *Id.* He had been going to counseling at the time of his testimony for a period of one year which is the longest he has ever been in counseling. (R. at 45–46.) Also at the time of the hearing, Diehl was taking lithium to treat his bipolar disorder and Wellbutrin to treat his depression. (R. at 47.) According to Diehl, he carries a lot of baggage relating to witnessing his mother commit suicide and to being sexually abused by his father. (R. at 48.)

Diehl testified that he has a long history of hospitalizations and rehabilitations for drug and alcohol abuse. (R. at 46.) He also testified that he had been clean for 14 months and that now he regularly attends NA and AA meetings in addition to attending counseling. (R. at 46.)

With respect to physical impairments, Diehl testified that his right hand and wrist are numb. (R. at 45.) He testified that he cannot pickup things, like a pen or coins, and cannot button his shirt with his right hand. (R. at 49). He could probably use his right hand together with his left hand to pick something up but because he has no feeling in his right hand he drops things when he tries to pick them up with only that hand. (R. at 50.) Therefore, according to Diehl, he relies on his left hand for everything now. (R. at 50.) That arm, however, "gets very tired" and "hurts very bad" after approximately 15–20 minutes of use. (R. at 50–51.) For instance, according to Diehl he buttons his shirt, zippers his pants, unbuttons his pants, buckles his belt all with his left hand but after he is finished getting dressed and taking a shower, his left arm hurts "very bad." (R. at 51.) At the time of the hearing, Diehl was being weaned off Neurontin and started on Elavil for pain. *Id.*

Diehl also testified as to activities of daily living. According to Diehl, he drives, but not very much. (R. at 41.) He testified that he usually gets driven to appointments or takes the bus. *Id.* He drove himself to the hearing and explained that he had no other choice. (R. at 41–42.) He walks half a mile to visit his son which he

tries to do "every day if possible." (R. at 41–42.) Diehl lives with a female friend (R. at 41), but does not cook or do the shopping (R. at 52). He is able to do "a little bit of vacuuming" and "a little bit of dusting." (R. at 52.) When he tried to do dishes he broke a couple of them. *Id.* He can tie his shoes but only loosely. (R. at 54.) With respect to eating, Diehl explained that he doesn't do a very good job when he eats and tries to eat pizza or food like that. (R. at 50.) He eats steak but has to have someone cut it for him and he cannot eat spaghetti because he cannot twist it and cannot put it in his mouth without getting it all over him. (R. at 54.) With respect to bathing, Diehl testified that he feels he has washed the right part of his body only since he cannot bend his arm behind his back or get it on the other side. *Id.* He testified that he cannot hold the soap in his right hand. *Id.* When asked what he does all day, Diehl testified that he goes to meetings, approximately three or four per day. (R. at 52.) He gets to his meetings by bus or by calling another recovering addict. *Id.* Diehl also testified that he watches a couple hours of television per day. (R. at 53.)

In addition to the medical evidence in this case, the ALJ heard and examined the testimony of Richard Bain, a vocational expert ("VE"). The VE was posed the following hypothetical:

> If we have an individual who is 41 to 45 years of age. Who has a high school education. But has a limited ability to read and write. And has past work as the claimant has had. If for purposes of this hypothetical this individual could do light exertional work. The individual could lift up to 20 pounds occasionally with bilaterally, 10 pounds frequently. Could only use the right arm occasionally for grasping or fine manipulation or as an assist for pushing and pulling with the right arm[, which] was the dominant arm. Could essentially do postural ac-

tivities. And could follow simple routine instructions. With those limitations would the individual be able to do any of the claimant's past work?

(R. at 56.) In response, the VE testified that Diehl's past work would be beyond Diehl's functional capacity. *Id.* However, in response to the question whether there would be any other work Diehl could perform, the VE testified that an individual with a functional capacity equivalent to Diehl's could do a range of light work including security work (non-confrontational positions), packing, and cashiering. *Id.* The VE explained that these jobs are generally cited for individuals who have limited upper extremity use to one arm. (R. at 57.) The VE was also asked whether there are jobs that require limited lifting but mostly entail walking or standing. The VE responded that there are jobs in the low-level light range such as attendant and usher type work activities and food prep work. *Id.* There is also light duty low level lifting such as packing. *Id.* When posed a modified hypothetical where the individual can only lift up to ten pounds, the VE testified that available jobs would be sedentary. (R. at 58.) The VE explained that there are sedentary cashiers, sedentary security guards, and sedentary packers. *Id.*

### E. *Application of the Substantial Evidence Standard*

As noted above, Diehl has raised several objections to the Magistrate Judge's Report and Recommendation. He argues that the Magistrate Judge erred in: (1) ruling that the ALJ did not err by failing to consult a medical expert at the hearing to determine whether the combination of Plaintiff's impairments met or equaled a listed impairment independent of drug and alcohol use; (2) ruling that the ALJ did not fail to comply with Social Security Ruling 00–4p; (3) adopting the ALJ's find-

ing that Plaintiff is literate; (4) failing to address Plaintiff's argument that the ALJ erred by failing to properly consider Plaintiff's ability to deal with stress; (5) adopting the ALJ's finding that Plaintiff has the residual functional capacity to perform light work; (6) failing to address Plaintiff's argument that the ALJ erred by failing to consider the full impact of Plaintiff's emotional impairments and to evaluate all evidence before her; and (7) adopting the ALJ's finding that Plaintiff's statements concerning his impairments are not totally credible. These objections will be addressed in turn.

1. *The ALJ's decision not to consult a Medical Expert*

 Prior to determining whether the ALJ's decision is supported by substantial evidence, "the Court must first be satisfied that the [P]laintiff has had a full and fair hearing under the regulations of the Social Security Administration and in accordance with the beneficent purposes of the act." *Maniaci v. Apfel,* 27 F.Supp.2d 554, 557 (E.D.Pa.1998) (citing *Echevarria v. Sec'y of Health and Human Services,* 685 F.2d 751, 755 (2d Cir.1982)). Among the duties of an ALJ in a social security case is the duty to fully develop the record before rendering a decision. *Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir.1995). This duty involves developing a complete medical record, 20 C.F.R. § 404.1512(d), and at times calling upon a medical expert, § 404.1512(f). For instance, an ALJ must call upon a medical expert to obtain an updated medical opinion in the following circumstances:

* When no additional medical evidence is received, but in the opinion of the [ALJ] ... the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or

* When additional medical evidence is received that in the opinion of the [ALJ]

... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

SSR 96-6p, 1996 WL 374180, at *3-4 (S.S.A. July 2, 1996). Under these circumstances, where the administrative record is inconclusive as to whether a claimant's impairments are equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, a medical expert should evaluate the impairments. *See Maniaci,* 27 F.Supp.2d at 554 (citing *Honeysucker v. Bowen,* 649 F.Supp. 1155, 1158 (N.D.Ill. 1986)) ("Where the record as it exists at the time of the administrative hearing fairly raises the question of whether a claimant's impairment is equivalent to a listing, a medical expert should evaluate it.").

Here, the ALJ did not call a medical expert before concluding that Plaintiff's impairments do not meet or equal criteria of any listed impairment. Plaintiff submits that this was error because the evidentiary record here raises the question, *i.e.,* is inconclusive as to whether Plaintiff's mental and physical impairments, in combination or alone, meets or equals a listing. Specifically, Plaintiff contends that his impairments, independent of drug and alcohol use, satisfy the criteria for Listing 12.04, pertaining to affective disorders, and 12.05(C), pertaining to mental retardation.

Before deciding whether the ALJ's decision not to call a medical expert was error, the Court must first note that Plaintiff cannot be considered disabled for purposes of receiving Disability Insurance Benefits "if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that [Plaintiff] is disabled." 42 U.S.C. § 423(d)(2)(C). The key factor in determining whether drug addiction or alcoholism is a contribut-

ing factor material to the determination of whether Plaintiff is disabled is whether Plaintiff would be disabled if he stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). With this limitation in mind, the Court will address Plaintiff's contentions that a medical expert was needed to aid the ALJ in determining whether Plaintiff's impairments satisfy the criteria for Listings 12.04 and 12.05(C).

a. *Listing 12.04: Affective Disorders*

Listing 12.04 is established when the requirements of both A and B below are satisfied, or when the requirements of C are satisfied:

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.04. The ALJ found that when Plaintiff is using drugs or alcohol, his mental

impairments meet the criteria of Part A and the functional limitations required by Part B but not the criteria required by Part C. (R. at 17.) As for the functional limitations required by Part B, the ALJ found that when Plaintiff was using drugs or alcohol, he had marked limitations in the area of activities of daily living, moderate limitations in the area of social functioning, and marked limitations in the area of maintaining concentration, persistence and pace. (R. at 17.) The ALJ also found that when Plaintiff was using drugs or alcohol he had one episode of decompensation, which the ALJ defined as a failure "to adapt to stressful circumstances which cause an individual either to withdraw from that situation or to experience an increase of signs and symptoms as an accompanying difficulty in maintaining activities of social living, social relationships, and/or maintaining concentration and task persistence." (R. at 18.)

▮ As required where there is evidence of drug addiction and alcohol dependence, the ALJ considered whether Plaintiff's impairments would satisfy the criteria of Listing 12.04 when he was not using drugs or alcohol. The ALJ determined that Plaintiff's psychological impairments may meet the criteria of Part A, but do not meet any of the functional limitations required by Part B, nor do they meet the criteria of Part C. (R. at 19–20.) With respect to functional limitations, the ALJ found that Plaintiff had a mild limitation in the area of activities of daily living, a mild degree of limitation in the area of social functioning, and a moderate degree of limitation in the area of maintaining concentration, persistence and pace. (R. at 20.) The ALJ found that when Plaintiff is not using alcohol and drugs, he has never exhibited episodes of decompensation. *Id.* Consequently, the ALJ determined that Plaintiff's impairments are not equivalent to Listing 12.04. The Court concludes, however, that it was premature for the ALJ to have reached this conclusion.

While the evidence of record could be viewed as supporting the ALJ's determination that Plaintiff's impairments do not meet the criteria for Listing 12.04, the Court finds that there is equally probative evidence in the record supporting the opposite conclusion. It is true that the evidence suggests that, absent drug and alcohol use, Plaintiff's mental impairments are not of a disabling severity. For instance, Dr. Silver reported that Plaintiff was in "stable physical and emotional condition" upon release from the Mirmont Treatment Center in November 2001. (R. at 144.) Dr. Kwapien, of the Pennsylvania Bureau of Disability Determination found that Plaintiff had been sober for eight months and was oriented and alert with intact memory. (R. at 157.) Dr. Kwapien also found that Plaintiff's speech was relevant, coherent, and goal-directed. *Id.* Dr. Kwapien found no evidence of "significant impairment of other mental faculties" nor did he find evidence of "bizarre ideation, delusions, paranoia or hallucinations." *Id.*

On the other hand, other evidence of record shows that a finding of equivalence to 12.04 is reasonable. First, Dr. Kasturirangan, who diagnosed Plaintiff with schizoaffective disorder (R. at 154), gave Plaintiff a Global Assessment of Functioning score of 50 (R. at 154) which, according to the *DSM–IV*, indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM–IV* at 34. This assessment can be viewed as describing a functional limitation under Part B insofar as Part B identifies "marked difficulties in maintaining social functioning" as a qualifying limitation.

Second, Dr. McCusker, a psychologist who evaluated Plaintiff in December of 2002, concluded that Plaintiff suffers from "pressured speech, severe depression, anxiety, impulsivity, and impatience." (R. at 229.) He noted that Plaintiff exhibited "major self-control difficulty" and "behaved with much intensity in language and action." *Id.* According to Dr. McCusker, Plaintiff's ego and self-esteem seemed very fragile, Plaintiff had much trouble with frustration tolerance and ability to delay, and Plaintiff tended to catastrophize what one would usually regard as everyday stressors. *Id.* Ultimately, Dr. McCusker opined that psychiatric treatment for Plaintiff is imperative. *Id.* This characterization of Plaintiff's impairments does not clearly qualify as a functional limitation under Part B, nevertheless, it could reasonably be viewed as describing a limitation in social functioning or a limitation in maintaining concentration, persistence, or pace, which "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)(3). In fact, the ALJ herself found that Plaintiff had a moderate degree of limitation in this latter area. (R. at 20.)

Alternatively, Dr. McCusker's assessment of Plaintiff could be viewed as describing an episode or series of episodes of decompensation, defined by the Social Security Administration's regulations as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(C)(4). To the extent Plaintiff

tends to catastrophize what one would usually regard as everyday stressors, Plaintiff has experienced a loss, or has an absence altogether, of adaptive functioning. Moreover, the regulations provide that "[e]pisodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." *Id.* Here, Dr. McCusker has opined that Plaintiff's symptoms are of such a severity that psychiatric counseling is imperative which is somewhat indicative of an episode or episodes of decompensation. The crucial question is whether Plaintiff has experienced repeated episodes of decompensation, each of an extended duration, characterized by the regulations as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *Id.* A medical expert would be helpful in answering this question.

For the foregoing reasons, the Court finds that because the evidence contained in the administrative record is inconclusive on the issue of whether Plaintiff's impairments meet or equal Listing 12.04, the ALJ was required to call upon a medical expert to aid in the determination of whether Plaintiff is disabled within this listing. Since the ALJ did not, the Court will vacate the Commissioner's decision denying benefits and remand the case to the Commissioner so that the ALJ may call a medical expert to opine as to whether Plaintiff's impairments are equivalent to Listing 12.04.[6]

b. *Listing 12.05(C): Mental Retardation*

Mental retardation, as defined in the regulations, refers to "significantly subaverage general intellectual functioning with

---

**6.** The Court offers no view as to whether or not once a medical expert is called Plaintiff would be in a position to satisfy the requirements of Listing 12.04.

deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05. The required level of severity for this disorder is met with "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05(C); *see also Burns v. Barnhart,* 312 F.3d 113, 124 (3d Cir.2002) (holding that where a claimant's IQ is above the 60–70 range a court should not ignore the plain wording of the regulation and read an error range of five points into the regulation).

■ Here, Plaintiff's verbal IQ score, as measured by the Wechsler Adult Intelligence Scale administered by Dr. McCusker in December of 2002, is 69.[7] This is within the range delineated by section 12.05(C). The Magistrate Judge suggests that this fact can be disregarded since not one medical source opined that Plaintiff is mildly mentally retarded. While this may ultimately turn out to be correct, it is premature to consider this fact before deciding, under the circumstances of this case, whether medical testimony is required to make the determination of whether Plaintiff's impairments meet the requirements of Listing 12.05(C).

Plaintiff's verbal IQ score alone "is not sufficient, however, to establish deficient intellectual functioning initially manifested during the developmental period (before age 22)." *Williams v. Sullivan,* 970 F.2d 1178, 1185 (3d Cir.1992). It must also be determined whether the evidence demonstrates or supports onset of Plaintiff's deficits in adaptive functioning before age 22

as well as whether Plaintiff has another impairment, in addition to the mental retardation, that imposes an additional and significant work-related limitation of function. *Id.* at 1184. With respect to the age of onset of Plaintiff's deficits in adaptive functioning, although there has been no evidence of prior intelligence testing which would have shed light on this issue, *see id.* at 1185, Plaintiff's testimony indicates that despite completing the twelfth grade he was placed in special education classes while in school. (R. at 42.) Plaintiff also reported to Dr. McCusker that he failed the first and sixth grades. (R. at 225.) More to the point, Plaintiff has specifically alleged problems reading, writing and spelling in school. *Id.* His performance in reading and spelling on the WRAT administered by Dr. McCusker confirm those difficulties. Plaintiff's raw score in word recognition (*i.e.,* reading) was 62 placing him in the first percentile and at a 3rd grade level. *Id.* His raw score in spelling was 57 placing him in the .5 percentile and at a 2nd grade level. *Id.* In addition to his reading and spelling difficulties, Plaintiff appears to have deficits in adaptive social functioning dating back to childhood. Plaintiff has reported rapid mood swings since childhood and a history of anger outbursts and irritability. (R. at 257.)

It should be noted that the fact that Plaintiff has held a job for most of his adult life does raise doubt as to Plaintiff's mental retardation. *See Williams,* 970 F.2d at 1185. The regulations consider this fact relevant in determining an individual's ability or inability to function in a work setting, *Id.* (citing 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(D)). However, Plaintiff's prior jobs all involved manual labor, jobs Plaintiff would be incapable of

---

**7.** The Social Security Administration's regulations explain that "[t]he IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(D)(6)(c).

performing today due to his physical impairments. Moreover, the issue before the Court is not whether Plaintiff satisfied the requirements of Listing 12.05(C), but whether the evidence of record conclusively answers this question such that a medical expert was not needed. For the reasons stated above, the Court finds that it does not.

■ Finally, with respect to whether Plaintiff has another impairment, in addition to mental retardation, that imposes an additional and significant work-related limitation of function, the medical evidence shows that Plaintiff has such an impairment. Diagnostic testing showed, and multiple physicians concluded, that Plaintiff suffered permanent nerve damage to his arms. At least one physician, Dr. Schwartz, opined that Plaintiff is "severely restricted with the use of his right hand as far as grip and dexterity." (R. at 164.) The medical evidence also shows that Plaintiff suffers from bipolar disorder and possibly borderline personality disorder. Dr. McCusker concluded that Plaintiff's greatest problems are emotionally-personality based and that Plaintiff would "require intensive social-emotional support in any training or employment setting, especially while he acclimates to it." (R. at 229.)

The ALJ herself found that the medical evidence establishes that Plaintiff is bipolar and has right hand median nerve axonopathy and left forearm hyposensitivity radial neuropathy, impairments that are severe within the regulations. (R. at 28.) "Severe impairment" is defined in section 404.1520(c) as having an "impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." See 20 C.F.R. § 404.1520(c). Significantly, the regulations provide that to determine whether an impairment imposes an additional and significant work-related limitation of function as required by Listing 12.05(C), the Social Security Administration will assess whether the impairment is severe under section 404.1520(c). 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(A). Therefore, since the medical evidence shows, and the ALJ agrees, that Plaintiff's bipolar disorder and physical injuries to his arms are severe, the requirement that Plaintiff have another impairment that imposes an additional and significant work-related limitation of function is satisfied.

Consequently, the Court finds that the evidence as to whether Plaintiff's impairments are equivalent to Listing 12.05(C) is inconclusive. Under these circumstances, the ALJ should have obtained the opinion of a medical expert. Therefore, the Court will also vacate the Commissioner's decision denying benefits on the basis that the ALJ was required to call a medical expert to determine whether Plaintiff's impairments are equivalent to Listing 12.05(C).[8]

### 2. Social Security Ruling 00–4p

■ Plaintiff asserts that the ALJ failed to comply with Social Security Ruling ("SSR") 00–4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000). This ruling provides that "[o]ccupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the [Dictionary of Occupational Titles (DOT)]." SSR 00–4p, at *2. It further provides that "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." Id.

---

**8.** The Court offers no view as to whether or not once a medical expert is called Plaintiff would be in a position to satisfy the requirements of Listing 12.05(C).

Here, Plaintiff points to what he believes are discrepancies between the VE evidence and the DOT. Particularly the VE testified that an individual with a residual functional capacity equivalent to that of Plaintiff could do a range of light work including security work (non-confrontational positions), packing, and cashiering. (R. at 56.) The VE explained that these jobs are generally cited for individuals who have limited upper extremity use to one arm. (R. at 57.) The VE further testified that there are jobs in the low-level light range that Plaintiff can perform such as attendant and usher type work and food prep work. *Id.* The VE also indicated that Plaintiff can perform jobs that entail light duty low level lifting such as packing. *Id.* Even if a person with Plaintiff's residual functional capacity were able to lift only ten pounds, the VE believes such a person would be able to perform sedentary work. (R. at 58.)

Plaintiff notes that according to the DOT the unskilled (meaning specific vocational preparation ("SVP") of 2 or less, *see* 3 *DOT* at 1009) light work jobs of the cashier variety are cashier II, *DOT* § 211.462–010, and parimutuel-ticket cashier, *DOT* § 211.467–022, which require frequent reaching, handling, and fingering, toll collector, *DOT* § 211.462–038, and sheet writer, *DOT* § 211.467–026, which require frequent reaching and handling and occasional fingering, and ticket seller, *DOT* § 211.467–030, which requires constant reaching, handling, and fingering. Unskilled light work or sedentary packer jobs including packer-fuser, *DOT* § 737.687–094, inspector-packer, *DOT* § 784.687–042, and those jobs that fall under the heading of "Packaging Options" in the DOT such as label coder, *DOT* § 920.587–014, sample clerk, handkerchief, *DOT* § 920.587–022, marker, semiconductor wafers, *DOT* § 920.587–026, carton-packaging-machine operator, *DOT* § 920.665–010, bander-and-cellophaner,

machine, *DOT* § 920.685–014, BB shot packer, *DOT* § 920.685–018, bottle packer, *DOT* § 920.685–026, candle wrapping-machine operator, *DOT* § 920.685–030, carder, *DOT* § 920.685–034, cigar brander, *DOT* § 920.685–046, cotton-role packer, *DOT* § 920.685–054, labeling-machine operator, *DOT* § 920.685–066, packer operator, *DOT* § 920.685–082, snuff-packing-machine operator, *DOT* § 920.685–094, bander-and-cellophaner helper, machine, *DOT* § 920.686–010, cotton-ball bagger, *DOT* § 920.686–014, folding-machine feeder, *DOT* § 920.686–018, packing-machine can feeder, *DOT* § 920.686–030, pad-machine feeder, *DOT* § 920.686–034, poly-packer and heat-sealer, *DOT* § 920.686–038, tray filler, *DOT* § 920.686–050, apple-packing header, *DOT* § 920.687–010, bagger, *DOT* § 920.687–018, bander, hand (paper goods industry), *DOT* § 920.687–026, bander, hand (tobacco industry), *DOT* § 920.687–030, bandoleer packer, *DOT* 920.687–034, blueprint trimmer, *DOT* § 920.687–038, bottling-line attendant, *DOT* § 920.687–042, can patcher, *DOT* § 920.687–054, cardboard inserter, *DOT* § 920.687–062, cotton tier, *DOT* § 920.687–074, dental floss packer, *DOT* § 920.687–082, floor worker, *DOT* § 920.687–090, handkerchief folder, *DOT* § 920.687–098, label remover, *DOT* § 920.687–106, linen-supply load-builder, *DOT* § 920.687–118, machine-pack handler, *DOT* § 920.687–122, marker II, *DOT* § 920.687–126, paper inserter, *DOT* § 920.687–138, repack-room worker, *DOT* § 920.687–146, rosin-barrel filler, *DOT* § 920.687–150, shoe packer, *DOT* § 920.687–166, shot packer, *DOT* § 920.687–170, snuff-box finisher, *DOT* § 920.687–174, stenciler, *DOT* § 920.687–178, table-cover folder, *DOT* § 920.687–186, tie binder, *DOT* § 920.687–190, vacuum tester, cans, *DOT* § 920.687–194, and worm packer, *DOT* § 920.687–202, all require either frequent or constant reaching

and handling. Unskilled light work jobs that fall under the general category of "Food and Beverage Preparation and Service Occupations" are fast-foods worker, *DOT* § 311.472–010, car hop (*i.e.*, drive-in waiter/waitress), *DOT* § 311.477–010, raw shellfish preparer, *DOT* § 311.674–014, bar attendant, *DOT* § 312.477–010, silver wrapper, *DOT* § 318.687–018, and fountain server, *DOT* § 319.474–010, which require either frequent or constant reaching, handling, and fingering, counter attendant, lunchroom or coffee shop, *DOT* § 311.477–014, deli cutter-slicer, *DOT* § 316.684–014, automat-car attendant, *DOT* § 319.464–010, and vending-machine attendant, *DOT* § 319.464–014, which require frequent reaching and handling and occasional fingering, and taproom attendant, *DOT* § 312.677–010, which requires frequent reaching and handling. Unskilled light work jobs under the heading "Cooking and Baking Occupations, N.E.C.," are kettle tender, *DOT* § 526.665–014, cook, vacuum kettle, *DOT* § 526.685–018, pan greaser, machine, *DOT* § 526.685–034, and potato-chip sorter, *DOT* § 526.687–010, all of which require frequent reaching and handling. The unskilled light work jobs under the heading "Ushers," are ticket taker, @*DOT* § 344.667–010, and press-box custodian, *DOT* § 344.677–010, which require frequent reaching and handling and usher, *DOT* § 344.677–014 which requires occasional reaching and handling. Plaintiff also argues that his bipolar disorder accompanied by impulsivity, impatience, difficulty with self-control, and frustration of tolerance would render him unable to frequently interact with people as would be required with ushering type work.

Although the DOT indicates that many of the types of jobs identified by the VE require frequent or constant reaching and handling, and in some cases fingering, it is not clear to the Court that there is a conflict between the VE evidence and the DOT. The fact that a job requires reaching, handling, or fingering does not necessarily mean that Plaintiff is incapable of performing that job since in some cases he may be able to satisfy the requirements of the job by reaching, handling, or fingering with his left hand with occasional assistance from his right hand. In this context then, the Court concludes that no material conflict exists between the DOT and the VE evidence, which assumed that Plaintiff could perform some cashier, security, packing, food preparation, usher, or attendant jobs. *Cf.*, *e.g.*, *Burns*, 312 F.3d at 127–28 (finding that the VE's testimony that the claimant could work as a "laundry sorter" appeared to conflict with the ALJ's finding that the claimant could perform only light work since the "laundry worker" positions described in the DOT required a level of exertion of at least "medium work"); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997) (finding a conflict where the VE testified that the claimant could be employed in certain jobs while according to the DOT, she lacked the necessary educational background required); *Rosser v. Chater*, No. Civ.A.94–5620, 1995 WL 717449, at *1 (E.D.Pa. Dec. 4, 1995) (finding a conflict where the VE testified that certain jobs are "sedentary" while according to the DOT, "those specific jobs mentioned require a level of exertion greater than 'sedentary' ").

Even assuming arguendo that there were a conflict between the VE evidence, which identified jobs Plaintiff could perform, and the DOT, which described those identified jobs as requiring frequent reaching and handling, and in some cases fingering, the Third Circuit has "not adopt[ed] a general rule that an unexplained conflict between a VE's testimony and the DOT necessarily requires reversal." *Boone v. Barnhart*, 353 F.3d 203, 206 (3d Cir.2003). In *Boone*, the Third Circuit recognized a split among the cir-

cuits in the face of a conflict between VE testimony and the DOT, noting that several circuits have held that an ALJ may base his findings on a VE's testimony that conflicts with the DOT, one circuit has held that the ALJ must always prefer the DOT over the testimony of the VE, and other circuits have adopted a "middle view" in which the ALJ must explain any decision to prefer the testimony of a VE over the DOT. *Id.* at 208–09 (internal citations omitted). Although remarking that the middle course "seems to be the most sensible," the Third Circuit refused to mandate reversal where an ALJ has failed to "discover and explain a conflict." *Id.*

Here, while the ALJ did not ask the VE specifically whether there were any conflicts between his testimony and the DOT descriptions of each job, such an inquiry was unnecessary in light of the detailed questioning of the VE by both the ALJ and Plaintiff's attorney. A review of the VE's testimony demonstrates that the VE was quite familiar with the DOT, as he referred to it specifically and repeatedly.

For the foregoing reasons, the Court finds that the ALJ's decision satisfied the requirements of SSR 00–4p.

### 3. *The ALJ's finding that Plaintiff is literate*

 Pursuant to 20 C.F.R. § 404.1520(a)(4)(v), education is a factor to be considered in determining whether a claimant can obtain substantially gainful employment. Where a claimant cannot perform any work that he has done in the past because of severe impairments, § 404.1520(a)(4)(v) requires the Social Security Administration to consider the claimant's "residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work." In evaluating an individual's educational level, the following categories are used: 1) illit-

eracy, 2) marginal education, 3) limited education, and 4) high school education and above. 20 C.F.R. § 404.1564(b). In the matter *sub judice*, the ALJ, in considering Plaintiff's educational background, found that Plaintiff is literate and has a high school education or the equivalent thereof. Plaintiff argues this finding is not supported by substantial evidence. For the following reasons, the Court agrees.

Under the regulations illiteracy is defined as "the inability to read or write ... a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." § 404.1564(b)(1). "High School education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above." § 404.1564(b)(4). Here, the record is lacking in evidence to support a finding one way or the other as to Plaintiff's literacy. Dr. McCusker, a psychologist, examined Plaintiff's cognitive abilities in December 2002 and upon administration of the WRAT determined that Plaintiff read at a third grade level and spelled at second grade level. (R. at 228.) A handful of courts have held that remand on the issue of literacy is appropriate where a claimant tests below a third grade level so that additional evidence can be gathered. *See, e.g. Wolfe v. Chater,* 86 F.3d 1072, 1075, 1077 (11th Cir.1996); *Stevens v. Barnhart,* No. 02–CV–7150, 2003 WL 22016922, at *8 (E.D.Pa. June 27, 2003); *Cole v. Apfel,* No. 98–C–6735, 2000 WL 290432, at *4–5 (N.D.Ill. March 17, 2000); *see also Skinner v. Sec'y of Health & Human Servs.,* 902 F.2d 447, 450–51 (6th Cir.1990) (finding a claimant to be illiterate, in part due to the claimant's testing below a third grade reading level on the WRAT). In addition to Plaintiff's

scores on the WRAT, administration of the Wechsler Adult Intelligence Scale yielded a verbal IQ score for Plaintiff of 69. (R. at 226.) Dr. McCusker was led to conclude that Plaintiff functions within the lowest limits of the Borderline range of intelligence. *Id.* Beyond formal cognitive testing, Plaintiff reported to Dr. McCusker that he has had longstanding learning problems and that he failed the first and sixth grades. (R. at 225.) Plaintiff testified at the hearing that he was placed in special education classes while in school. (R. at 42.) Plaintiff provided further insight into his reading and cognitive abilities during the hearing testifying that he has difficulty with reading, writing, spelling and comprehension. (R. at 42–43.) He also testified that he has tried to read the newspaper, but has trouble comprehending what he is reading to the extent that it discourages him from wanting to read. (R. at 42.)

Although the record in this case indicates that Plaintiff has completed the twelfth grade, the Social Security Administration "recognizes that even someone with formal schooling may be deemed illiterate." *Frontanez–Rubiani v. Barhardt,* No. Civ.A.03–1514, 2004 WL 2399821, at *5 (E.D.Pa. Sept. 30, 2004). The regulations provide that "the numerical grade level that you completed in school may not represent your actual educational abilities." 20 C.F.R. § 416.964(b). Numerical grade level is properly relied upon only where contradictory evidence does not exist. *Id.;* § 404.1564(b). As the record in this case contains contradictory evidence, the fact that Plaintiff completed the twelfth grade alone cannot be relied upon to conclude that Plaintiff is not illiterate. Therefore, the Court is left to conclude that the evidence of record is insufficient in this case to support a finding that the

Plaintiff is literate in light of Plaintiff's scores on the WRAT and the Wechsler Adult Intelligence Scale, Plaintiff's testimony concerning his difficulties reading, writing, spelling, and comprehending, and Plaintiff's educational history, namely the fact that he failed the first and sixth grades and was enrolled in special education classes. This does not mean, of course, that there is substantial evidence to support a classification of Plaintiff as illiterate. Rather it means that on remand the ALJ should have Plaintiff's reading ability tested. *See Stevens,* 2003 WL 22016922, at *8. Ascertaining reading ability may simply involve asking Plaintiff "to read aloud a short news article, or asking him to write a note." *Cole,* 2000 WL 290432, at *4.

### 4. Alleged failure of the ALJ to properly consider Plaintiff's ability to deal with stress

Plaintiff asserts that the ALJ failed to properly consider and evaluate Plaintiff's ability to deal with stress. Plaintiff supplies two arguments in support of this assertion. First, Plaintiff argues that the ALJ failed to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. Second, Plaintiff argues that the ALJ's hypothetical question to the VE should have included limitations regarding stress. In support of both arguments, Plaintiff notes that Dr. McCusker observed that Plaintiff is impulsive, impatient, has major difficulty with self-control and frustration tolerance, and is readily intimidated by cognitive and other performance tasks. Plaintiff further notes that Dr. Kwapien, who examined Plaintiff at the request of the state agency, found that Plaintiff had a "fair" ability to deal with work stresses. The Court will address each of Plaintiff's

arguments concerning the ALJ's consideration of Plaintiff's ability to deal with stress in turn.

### a. Consideration of impairment-related limitations created by stress in assessing residual functional capacity

 Plaintiff first contends that the ALJ failed to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. As authority for his position, Plaintiff relies on Social Security Ruling ("SSR") 85–15, 1985 WL 56857, at *6 (S.S.A.1985), which requires that consideration be given in the residual functional capacity assessment to the impact of limitations created by stress. SSR 85–15 provides in pertinent part:

Since mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands of "stress" of the workplace is often extremely difficult. This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis.

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty and individual will

have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [Therefore, *any*] *impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the [residual functional capacity] assessment.*

SSR 85–15, at *6 (emphasis added). The purpose of SSR 85–15 is to emphasize:

(1) that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

SSR 851–5, at *1.

In view of the purpose and mandate of SSR 85–15, the ALJ was required to give due consideration to Plaintiff's ability to deal with stress in assessing Plaintiff's residual functional capacity to perform work. The Court finds that the ALJ fulfilled this obligation. For starters, the ALJ repeatedly noted in her decision that absent drug or alcohol use, Plaintiff has never exhibited episodes of decompensation (R. at 20, 22, 24), which the ALJ described, in short, as repeated failures to adapt to stressful circumstances (R. at 20). The ALJ noted that even when using drugs or alcohol, Plaintiff exhibited only one episode of decompensation. (R. at 18.)

It is true that the ALJ did not specifically include in her decision, as Plaintiff would have liked, Dr. McCusker's observation that Plaintiff is impulsive, impatient, has difficulty with self-control and frustration tolerance, and is readily intimidated by cognitive and other performance tasks. (R. at 229.) However, the ALJ instead took into account the fact that Plaintiff attended anger management classes (R. at 19), was diagnosed with bipolar disorder (R. at 19, 20) and polysubstance abuse (R. at 17, 19), and had moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) (R. at 19). The ALJ also considered Dr. McCusker's findings revealing that Plaintiff has difficulty with reading and spelling (R. at 228.), which Plaintiff testified causes him to get frustrated and depressed. (R. at 42.)

With respect to Dr. Kwapien's medical opinion, the ALJ elected not to focus on his conclusion that Plaintiff has a "fair" ability to deal with work stresses. Rather, the ALJ referenced Dr. Kwapien's judgment that in most areas of occupational, performance and personal-social function, Plaintiff had a good ability to make adjustments. (R. at 19.)

For the foregoing reasons, the Court finds that the ALJ's assessment of Plaintiff's residual functional capacity properly encompassed consideration of Plaintiff's ability to deal with stress.

b. *Inclusion of impairment-related limitations created by stress in the hypothetical*

Plaintiff's second criticism as it relates to consideration of his ability to

deal with stress is that the hypothetical posed to the VE failed to include limitations created by stress. A hypothetical question posed to a vocational expert must specify *all* of a claimant's impairments that are supported by the record. *Burns,* 312 F.3d at 123 (quoting *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir.1987)). "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question to a vocational expert, the expert's response is not considered substantial evidence." *Id.* (citing *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984)).

Here, it cannot be said that there exists in the record medically undisputed evidence of impairment-related limitations created by stress. Certainly there is some evidence of impairment-related limitations created by stress, particularly Dr. McCusker's assessment that Plaintiff is impulsive, impatient, has difficulty with self-control and frustration tolerance and is readily intimidated by cognitive and other performance tasks and Dr. Kwapien's conclusion that Plaintiff has a "fair" ability to deal with work stresses. However, as indicated in the previous section, there is equally, if not more, evidence in the record that occupationally Plaintiff had a good ability to make adjustments to the stresses of work. Therefore, it was not error for the ALJ to exclude mention of impairment-related limitations created by stress in the hypothetical posed to the VE.[9]

5. *Plaintiff's remaining objections*

Plaintiff has also argued that the Magistrate Judge erred in adopting the ALJ's

---

9. It should be noted that it is conceivable that upon remand the evidence solicited by a medical expert may render it necessary for the ALJ to include in the hypothetical to the VE information concerning impairment-related limitations created by stress. At this time the Court will not speculate on the likelihood of such a necessity arising.

finding that Plaintiff has the residual functional capacity to perform light work; in failing to address Plaintiff's argument that the ALJ erred by failing to consider the full impact of Plaintiff's emotional impairments and to evaluate all evidence before her; and in adopting the ALJ's finding that Plaintiff's statements concerning his impairments are not totally credible. To the extent that the ALJ will now need to obtain testimony from a medical expert, and draw conclusions in light of that testimony, the Court will withhold judgement on these issues until the matter is rehearsed by the ALJ and a full and complete record is developed.

## III. CONCLUSION

For the foregoing reasons, the Court will sustain objections 1 and 3, overrule with prejudice objections 2 and 4, and overrule without prejudice objections 5, 6 and 7. Accordingly, the Court will vacate the decision of the Commissioner denying benefits and order the matter remanded to the Commissioner for further proceedings in conformity with this Opinion. Upon remand, the ALJ shall obtain a medical expert opinion as to whether Plaintiff's impairments are equivalent to a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Also, the ALJ shall cause Plaintiff's reading ability to be tested and shall consider the results in determining whether Plaintiff is literate as defined by the regulations.[10] An appropriate order follows.

10. Again, the Commissioner's decision in this case may ultimately turn out to be correct and nothing in this Opinion is to be taken to suggest that the Court has presently concluded otherwise. However, in the absence of a

## ORDER

AND NOW, this 7th day of February, 2005, upon consideration of the cross-motions for summary judgment, and after review of the Report and Recommendation of United States Magistrate Judge Linda K. Caracappa (doc. no. 18) and Plaintiff's Objections thereto (doc. no. 19), it is hereby ORDERED for the reasons provided in the accompanying memorandum that:

1. Plaintiff's Objections (doc. no. 18) are SUSTAINED in part and OVERRULED with prejudice in part;

2. Plaintiff's motion for summary judgment (doc. no. 12) is GRANTED in part and DENIED in part;

3. Defendant's motion for summary judgment is GRANTED in part and DENIED in part; and

4. The matters as to which the Objections are sustained are REMANDED to the Commissioner of the Social Security Administration for further proceedings in conformity with the accompanying Memorandum.

AND IT IS SO ORDERED.

sufficiently developed record, the Court cannot satisfy its obligation to determine whether or not the Commissioner's decision was supported by substantial evidence.